# UNITED STATES DISTRICT COURT

for the

FILED 13 MAR '19 15:21 USDC-ORP

_________ District of _________

_________ Division

Raziel Briah AKA Scott Smith

*Plaintiff(s)*

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-v-

Washington County Oregon

*Defendant(s)*

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

Case No. 3:19-cv-389-YY

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* [X] Yes [ ] No

## COMPLAINT FOR A CIVIL CASE

**I. The Parties to This Complaint**

**A. The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Raziel Briah |
| Street Address | 6000 NE 80th Ave. |
| City and County | Portland, Multnomah |
| State and Zip Code | Oregon 97218 |
| Telephone Number | (971) 238-4633 |
| E-mail Address | RazielBriah777@gmail.com |

**B. The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Toby Stang |
| Job or Title *(if known)* | Risk Management Analyst Washington County |
| Street Address | 155 North First Ave. Suite 270 MS11 |
| City and County | Hillsboro, Washington County |
| State and Zip Code | Oregon 97124 |
| Telephone Number | 503-846-4514 |
| E-mail Address *(if known)* | N/A |

Defendant No. 2

| | |
|---|---|
| Name | April Yates |
| Job or Title *(if known)* | Lawyer / Public Defender |
| Street Address | 400 E Main St #210 |
| City and County | Hillsboro, Washington County |
| State and Zip Code | Oregon, 97123 |
| Telephone Number | 503-726-7900 |
| E-mail Address *(if known)* | N/A |

Defendant No. 3

| | |
|---|---|
| Name | Julie Francom and Olga Kameneva |
| Job or Title *(if known)* | Probation officer's |
| Street Address | 150 N 1st Ave #200 |
| City and County | Hillsboro, Washington County |
| State and Zip Code | Oregon, 97124 |
| Telephone Number | 503-846-3400 |
| E-mail Address *(if known)* | N/A |

Defendant No. 4

| | |
|---|---|
| Name | Tyler Bissette |
| Job or Title *(if known)* | District Attorney |
| Street Address | 150 N 1st Ave #300 |
| City and County | Hillsboro, Washington County |
| State and Zip Code | Oregon, 97124 |
| Telephone Number | (503) 846-8671 |
| E-mail Address *(if known)* | N/A |

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Prisoner Civil Rights Constitutional Amendments 1st, 2nd, 4th, 5th, 6th, 7th, 8th, 9th, 13th, 14th,
Negligence
Civil Rights
Human Right United Nations Declaration of Human Rights
Constitution Article 6, 7, 9, 10, 11, 12, 15, 17, 18

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s) N/A

a. If the plaintiff is an individual

The plaintiff, *(name)* ____________________, is a citizen of the State of *(name)* ____________________.

b. If the plaintiff is a corporation

The plaintiff, *(name)* ____________________, is incorporated under the laws of the State of *(name)* ____________________, and has its principal place of business in the State of *(name)* ____________________.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

a. If the defendant is an individual

The defendant, *(name)* ____________________, is a citizen of the State of *(name)* ____________________. Or is a citizen of *(foreign nation)* ____________________.

b. If the defendant is a corporation

The defendant, *(name)* ______________________, is incorporated under the laws of the State of *(name)* ______________________, and has its principal place of business in the State of *(name)* ______________________. Or is incorporated under the laws of *(foreign nation)* ______________________, and has its principal place of business in *(name)* ______________________.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

______________________________________________

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

My Prisoner Civil Rights, US constitutional Rights, Bill of Rights, United Nations declaration of Humane Rights were violated multiple times By washington County Correctional officers, washington County Police and Lawyers violated my Rights and forced me into a "Poverty Trap" and forced to file Federal Bankruptcy wrongfully Imprisoned as well Gross negligence unethical & unconstitutional

See Attached paper's As well

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

"See Attached papers As well" ~~lost Housing uprooted~~

Due to the unconstitutional actions above, I was uprooted lost my Apartment, my Job, filling Chapter #7, Family Law and Custody was Negatively effected,

Seeking ~~[illegible]~~ Financial Restitution of damages do to Now in a state of Federal Poverty, Indegent

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 3/13/19

Signature of Plaintiff Raziel Briah

Printed Name of Plaintiff Raziel Briah

### B. For Attorneys

Date of signing: ____________

Signature of Attorney ____________

Printed Name of Attorney ____________

Bar Number ____________

Name of Law Firm ____________

Street Address ____________

State and Zip Code ____________

Telephone Number ____________

E-mail Address ____________

## Case: 14CV10881- Yr.2014 (Legal Name Change)

## I Raziel Briah aka Scott d. Smith

## Case: Federal Civil Grievance & Complaint: Washington County Oregon.

I Raziel Briah aka Scott Smith the victim in the matter, will give a brief opening statement on the matters of the Federal Civil Grievance & Complaint against Washington County district of Oregon. The Washington County district attorney's office, Washington County public defenders, Washington County Probation & Parole, Washington County Sheriff's office & jail, and Washington County Police violated my rights in the year of January 2018, the reason of the elapsed time of filling this complaint is due to a break in (due proses of law) which is a Constitutional right. The rights that were violated by these Washington County government authorities were the American Constitutional rights, Bill of rights, Civil rights and International Human Rights under the United Nations, reference United Nations. The Constitutional amendments 1st, 2nd, 4th, 5th, 6th, 7th, 8th, 9th, 13th, and 14th, reference United States Constitution. United Nations International declaration Of Human rights under Article 6, Article 7, Article 9, Article 10, Article 11, Article 12, Article 15, Article 17, and Article 18. Also Washington county government authorities committed acts of gross negligence as well as forcing me into a "Poverty Trap". (Harvard Law Confronting criminal Justice) a "Guide for policy reform" reference from pages (Intro) 1,2,3,4 also references from pages 15, 16, and 19 attached is full draft. Also reference Lewis & Clark Criminal Justice Reform Clinic (CJRC). Reverence cases as follows. Case in appeal#18CR01842 & Case#A167458.Case #18CR01842 & Case#A167458 Alleged victim admitted to poisoning, hitting, pushing and chocking me while saying she wanted to kill "me" Raziel Briah aka Scott Smith the real victim" (Reference American Greed on CNBC Murderous Plot Meets Reality TV Season 12 Episode 153) (3-12-2018) "Alleged victim Gay Alexander knowingly made false report to steal from me and force me into poverty, reference False report alleged victim laughing during 911 call negligence on Washington County 911 dispatcher reference: State Trooper "Nic CederBerg" federal case. Former Washington County Police Officer "Angela Branford" (DV case tampering) reference case: "Angela Branford" accessed data for friends DV case, also sued Washington County for discrimination. Medical malpractice reference all cases with Corizon Health. Reference as well as "Madaline Pitkin" vs "Corizon Health". Reference all civil rights cases ( "Prisoner Civil Rights In Washington County") follows: Case-Adolf Mandujano, Francisco Rodriguez Jr., Also Washington County government Authorities made false statements in regards to a United Nations Non-Government Organization (NGO) that was founded by me the victim and other members which was closed and United Nations was notified of identity theft and the closing of the NGO back in 2015 and formally notified again in 2019 due to Washington County fictitious claims reference the United Nations.Case- Wallace v. Washington County Jail et al, Case- Barber v. Garrett et al #3:18-cv-01257. Do to wrongful imprisonment in Washington County Both of my Family law cases were negatively affected as well as parenting time with kids, reference Multnomah County Case#16DR18631 Raziel Briah vs Saphoeun Ouk and Multnomah County Case#16DR18634 Raziel Briah vs Dorothy Patrick. Also reference Multnomah County Case#16SC12259 and Case#16PO-02480 restraining order case with victim me, Raziel Briah vs Bounthavy Bounkhong the violent aggressor is Bounthavy Bounkhong and defamation of business name and stole business property. Do to these violations that victimized me as an American citizen, I was uprooted from my established residence and home to unhoused during the cold wintertime. Forced to be in a state of extreme poverty and file chapter 7 bankruptcy. Attached is complaints from the Oregon state bar, Oregon Medical Board, Department of Human Services claiming status of indigence as a direct result of the unethical, inhumane and unconstitutional acts of Washington County government authorities. This is a light basic draft of the complaint. Further documentation and information will be added via attorney.

Oregon

Office of Public Defense Services
**Appellate Division**
1175 Court Street NE
Salem, Oregon 97301-4030
Telephone (503) 378-3349
Fax (503) 378-2163
**www.oregon.gov/opds**

January 15, 2019

Raziel Olam Briah
6000 NE 80th Ave
Portland OR 97218

Re: Our File No. 69175
Washington County Circuit Court Case No. 18CR01842

Dear Mr. Briah:

Enclosed is a copy of the Appellant's Opening Brief that was filed in your case on January 15, 2019. The state's Respondent's Answering Brief is currently due to be filed on July 16, 2019. I will send you a copy of the Respondent's Brief.

Once both the Appellant's Brief and the Respondent's Briefs have been filed, the court will schedule your case for review by a three-judge panel of the Court of Appeals. Even after your case has been assigned to a panel of judges, it may take several weeks or even many months for a decision in your case. I will keep you updated by letter as we proceed through each significant stage of your appeal.

Please feel free to write or call if you have any questions about your case. This office accepts collect phone calls on the first and third Thursday of each month, from 9 a.m. to 12 noon, and from 1 p.m. to 3 p.m.

Sincerely,

Kyle Krohn
Deputy Public Defender
Criminal Appellate Section

Enclosure




# Universal Declaration of Human Rights

## Article 1.

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

## Article 2.

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

## Article 3.

Everyone has the right to life, liberty and security of person.

## Article 4.

No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

## Article 5.

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

## Article 6.

Everyone has the right to recognition everywhere as a person before the law.

## Article 7.

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

## Article 8.

Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law.

## Article 9.

No one shall be subjected to arbitrary arrest, detention or exile.

## Article 10.

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

## Article 11.

(1) Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.
(2) No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a penal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offence was committed.

## Article 12.

No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks.

## Article 13.

(1) Everyone has the right to freedom of movement and residence within the borders of each state.
(2) Everyone has the right to leave any country, including his own, and to return to his country.

## Article 14.

(1) Everyone has the right to seek and to enjoy in other countries asylum from persecution.
(2) This right may not be invoked in the case of prosecutions genuinely arising from non-political crimes or from acts contrary to the purposes and principles of the United Nations.

## Article 15.

(1) Everyone has the right to a nationality.
(2) No one shall be arbitrarily deprived of his nationality nor denied the right to change his nationality.

## Article 16.

(1) Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. They are entitled to equal rights as to marriage, during marriage and at its dissolution.
(2) Marriage shall be entered into only with the free and full consent of the intending spouses.
(3) The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

## Article 17.

(1) Everyone has the right to own property alone as well as in association with others.
(2) No one shall be arbitrarily deprived of his property.

## Article 18.

Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.

## Article 19.

Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers.

## Article 20.

(1) Everyone has the right to freedom of peaceful assembly and association.
(2) No one may be compelled to belong to an association.

## Article 21.

(1) Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.
(2) Everyone has the right of equal access to public service in his country.
(3) The will of the people shall be the basis of the authority of government; this will shall be expressed in periodic and genuine elections which shall be by universal and equal suffrage and shall be held by secret vote or by equivalent free voting procedures.

## Article 22.

Everyone, as a member of society, has the right to social security and is entitled to realization, through national effort and international co-operation and in accordance with the organization and resources of each State, of the economic, social and cultural rights indispensable for his dignity and the free development of his personality.

## Article 23.

(1) Everyone has the right to work, to free choice of employment, to just and favourable conditions of work and to protection against unemployment.
(2) Everyone, without any discrimination, has the right to equal pay for equal work.
(3) Everyone who works has the right to just and favourable remuneration ensuring for himself and his family an existence worthy of human dignity, and supplemented, if necessary, by other means of social protection.
(4) Everyone has the right to form and to join trade unions for the protection of his interests.

## Article 24.

Everyone has the right to rest and leisure, including reasonable limitation of working hours and periodic holidays with pay.

## Article 25.

(1) Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.
(2) Motherhood and childhood are entitled to special care and assistance. All children, whether born in or out of wedlock, shall enjoy the same social protection.

## Article 26.

(1) Everyone has the right to education. Education shall be free, at least in the elementary and fundamental stages. Elementary education shall be compulsory. Technical and professional education shall be made generally available and higher education shall be equally accessible to all on the basis of merit.
(2) Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace.
(3) Parents have a prior right to choose the kind of education that shall be given to their children.

## Article 27.

(1) Everyone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits.
(2) Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author.

## Article 28.

Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized.

## Article 29.

(1) Everyone has duties to the community in which alone the free and full development of his personality is possible.
(2) In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society.
(3) These rights and freedoms may in no case be exercised contrary to the purposes and principles of the United Nations.

## Article 30.

Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein.

Oregon State Bar

1/29/2019 11:02:02 AMTo: Raziel Briah

**Following is a record of your complaint filed with the Oregon State Bar.**
**Please retain this for your records.**

**Name and Address of COMPLAINANT**

Mr Raziel Briah
6000 NE 80th Ave
poretland, OR 97218
Primary Phone: 971-238-4633
Secondary Phone:
Email: RazielBriah777@gmail.com

**Name and Address of ATTORNEY**

Ms Tyler Bissette: Washington County District Attorney
150 N 1st Ave Suite 300
Hillsboro, OR 97124
Primary Phone: (503) 846-8671
Secondary Phone:

**COMPLAINT**

From Jan 2018 to Mar. 2018 Tyler Bissette was district attorney and prosecutor of my case. Tyler Bissette was unethical in many ways. There was "charge stacking" numerous instances of the same charge. My address was out of Washington County Jurisdiction in Hillsboro, I lived in Portland Oregon at the time and the Portland police or Multnomah County police normally come to the apartment not the Washington County police from Hillsboro. No jurisdiction, false evidence, no physical evidence, perjury, illegal search and seizure, past my 60 days speedy trial I did not "wave time" so my rights were violated. Tyler Bissette made numerous fictitious claims that were flat out lies to the jury. She knew there was no jurisdiction in Hillsboro and prosecuted me anyway. She lied and said I had a gun and I never had a gun nor was one in the discovery. Tyler Bissette endorsed and advocated for the misconduct of the Washington County police and there false evidence that was fabricated and spray painted and fake pictures that were not real were allowed to be shown as factual evidence. Also Tyler Bissette didn't release my discovery until two weeks before my trial with malicious and deceitful intent. Many times Tyler Bissette tried to coerce me into taking a plea deal and extending time on multiple occasions that I declined. Tyler Bissette never offered any diversion for the misdemeanor offense which is standard on the charges that were against me at that time,

and pleaded with the judge to get me six years on misdemeanor charges for retaliation for not taking her coerce plea deal and extension of time outside my speedy trial 60 days. She demanded I pay outrageous amounts of fines and fees around $7,000 on misdemeanors. Tyler Bissette committed and uses unethical tactics and or endorsed for malpractice and the violation of my civil rights & U.S constitution amendments such as the 4th,5th,6th,7th,8th,14, amendments were violated & human rights were violated as well. Tyler Bissette deliberately committed mal practice, abuse of power, malfeasance and violations of my rights. Tyler Bissette had a prepacked jury and didn't allow me to properly pick the jurors I wanted which is my right to a fair trial by the jury of my peers which I couldn't pick. Tyler Bissette is responsible for civil rights violations, malpractice, unethical practices, and violations of constitutional rights. Tyler Bissette should not be allowed to practice law. Tyler Bissette told me with her own mouth that Washington County has a 95% conviction rate. I'm a victim of Tyler Bissette illegal and unethical practices in Washington County solely to make herself look good and keep up her so called high conviction rate, by any means necessary. Even if it's by coercion, false evidence, illegal search or seizures and violating the general public's civil & human rights. I am certain I am not the only victim of Tyler Bissette.

**ATTACHMENTS**

Oregon State Bar

1/29/2019 10:14:37 AMTo: Raziel Briah

**Following is a record of your complaint filed with the Oregon State Bar.**
**Please retain this for your records.**

**Name and Address of COMPLAINANT**

Mr Raziel Briah
6000 NE 80th Ave
Portland, OR 97218
Primary Phone: 971-238-4633
Secondary Phone:
Email: RazielBriah777@gmail.com

**Name and Address of ATTORNEY**

April Yates: Metropolitan Public Defenders
400 E. Main ST. Suite 210
Hillsboro, OR 972123
Primary Phone: 503-726-7900
Secondary Phone:

**COMPLAINT**

From January 2018 to March 2018 I was assigned a defense attorney named April Yates, with the metropolitan public defenders located in Hillsboro or Washington County. April Yates literately did nothing to represent me. She was an inadequate lawyer. She never addressed issues such as my address was out of Washington County Jurisdiction in Hillsboro, I lived in Portland Oregon at the time and the Portland police or Multnomah County police normally come to the apartment not the Washington County Police from Hillsboro. She didn't defend against the issues of no jurisdiction, false evidence, no physical evidence, perjury, illegal search and seizure, past my 60 days speedy trial I did not "wave time" so my rights were violated and she never called or subpoenaed my five witnesses that would have been critical role to my trial. Also April Yates endorsed the fictitious claims the district attorney made, April Yates sided with the district attorney not me her client. I was deliberately deceived and patronized by my attorney April Yates. April Yates bamboozled me on my trial date do to she lied about doing things like calling witnesses going over the false evidence and other things and it was all smoke and mirrors and was nothing more than a delicate balancing act of malpractice. I asked many times for new council do to I thought she was inadequate and she refused multiple times to turn the case over to another lawyer. Also there was an issue were I was not able to pick my jury properly. The jury was basically already picked and I had little to no participation in

the jury assignment or picking. I told April Yates about the jury issue she shrugged her shoulders and made a sarcastic frowned face. Also the whole time it was hard to get a hold of her left multiple VM and Written letters and little to no response. I informed metropolitan public defenders located in Hillsboro and the response was April Yates has done nothing wrong. Also metropolitan public defenders located in Hillsboro sent a letter after I fired and had to represent myself on my trial date is that I voluntary let her go despite me asking over a period of 62 days for another attorney. I was told by her that my case was not a priority to her from her own words out her mouth. April Yates endorsed for malpractice and the violation of my civil rights & U.S constitution amendments such as the 4th,5th,6th,7th,8th,14, amendments were violated & human rights were violated as well. April Yates deliberately committed mal practice, abuse of power, malfeasance and violations of my rights. A lawyer also has a responsibility to protect and serve their client. If the client is a defendant in a case, they have a right to a speedy trial as well as adequate representation by their lawyer. The lawyer appointed to or hired by the defendant should abide by the policies of the legal system, which were created to ensure justice for the defendant. April Yates did malpractice, leaked client confidently. April Yates acted unethical and attempted on many accusations tried to coerce me into signing for an extension of time outside the 60 day speedy trial because the district attorney asked her to. Also she coerces me to take a plea deal multiple times which I declined. April Yates was in cahoots and colluding or conspiring together secretly with the district attorney. I believe April Yates has many more victims of malpractice and unethical tactics other than me.

**ATTACHMENTS**




# Complaint Form

Revised 9/2017

This form may be used to file a complaint with the Oregon Medical Board regarding care provided by the following medical practitioners: Medical Doctors, Doctors of Osteopathic Medicine, Podiatrists, Physician Assistants, and Acupuncturists. *Please note: the Oregon Medical Board does not have jurisdiction over Nurses, Nurse Practitioners, Medical Assistants, medical office staff, hospitals, or clinics.*

***A complaint may also be filed without using this form by submitting a detailed written letter to the Board summarizing your complaint.***

If you chose to use this Complaint Form, please complete the following information. Please attach any photocopies of documents, including medical records if available, that are pertinent to your complaint. State in detail all facts which you believe justify your complaint. Use additional paper as necessary.

**1) Name of Complainant (Your Name):**

First: Raziel Middle: Olam Last: Briah
Address: 6000 NE 80th AVE
City: Portland State: OR Zip: 97218
Date of birth: 03/30/1985 Relationship to Patient: Self
Home Phone: ______ Cell Phone: (971) 238-4633 Fax: ______
E-mail Address: RazielBriah777@gmail.com

**2) Name of Patient (if not complainant above):**

First: Self N/A Middle: ______ Last: ______
Address: ______
City: ______ State: ______ Zip: ______
Date of birth: ______ Phone: ______

**3) Complaint Against:**

| Medical Doctor | Doctor of Osteopathic Medicine | Podiatrist | Physician Assistant | Acupuncturist |
|---|---|---|---|---|
| ◉ | ○ | ○ | ○ | ○ |

Provider Name - First: Kimilia Middle: Jenae Last: Kent
Address: 5257 NE Martin Luther King Jr Blvd Suite 201
City: Portland State: OR Zip: 97211
License Number *(if known)*: RPH-0015729 Phone: (503) 676-3710




# Complaint Form

Revised 9/2017

**4) Specific Information about your Complaint:**

a. What are the dates that the provider in question cared for you/patient?

July.2017-Dec.2017

b. Have you contacted the provider directly about your complaint? (●) Yes ( ) No

If so, what action (if any) was taken?

I E-mailed.
raziel briah <razielbriah777@gmail.com>
Oct 26, 2017, 12:00 PM
to kimilia.kent kimilia.kent@empowermentclinic.com

Sent Mutiple e-mails to her and talked with her for many months and still no medication.

c. Did any other provider(s) treat you/patient after the alleged incident? (●) Yes ( ) No

If YES, please specify names and address of other providers:

Docters at AFC Ugent Care 5 NW 23rd Pl, Portland, OR 97210.

d. Have you/patient been treated at any hospitals or urgent care facilities related to this complaint? (●) Yes ( ) No

If YES, please identify the facility name and address as well as the date of treatment

Legacy Good Samaritan Medical Center: 1015 NW 22nd Ave, Portland, OR 97210Emergency Room. In Nov & Dec. 2017

e. Have you filed this complaint elsewhere? ( ) Yes (●) No

If yes, where?

N/A

What action was or is being taken?

Nothing was resolved only got the run around from mutiple people at the Empowerment Clinic 5257 NE Martin Luther King Jr Blvd Suite 201, Portland, OR 97211



# Complaint Form

Revised 9/2017

**5) Please describe your complaint in detail below (use additional paper if necessary):**

Around year 2015-2016 I got a mental health diagnosis from Dr. Stephanie M. Lopez. I was asked multiple questions and the intake and assessment lasted 3 hours. I had a past diagnosis of some conditions already. I received the "original" report and it was nothing more than a fictitious and incorrect diagnosis. It stated I was bipolar and possible multiple personality disorder as well as possible schizophrenia. None of these allegations were correct and multiple doctors and my second opinion by another doctor stated that the diagnosis of Dr. Stephanie M. Lopez was fabricated and made for the sole purpose of defamation of my character. The report had stuff we never even talked about in the assessment. It said I was a violent person and mentally unstable and a threat to the general public. This assessment affected me because it's still on file, and when I seek medical services other doctors ask about the old report and take note of it even though the findings are inaccurate and factious. Literality made up some random stuff and biased based assessment that forces me to restore credibility in mental health.

Also Broke HIPPA Law – Broke Medical Client Confidentiality on my Sharing my medical Info to people without my Consent

**I certify that the above information is true to the best of my knowledge.**

Signature of Complainant [signature] Date 1/28/2019

To submit this complaint to the Board, please print this document and mail it to the Board at the following address:

**Oregon Medical Board**
**1500 SW 1st Ave, Suite 620**
**Portland, OR 97201**




# Complaint Form

Revised 9/2017

**4) Specific Information about your Complaint:**

a. What are the dates that the provider in question cared for you/patient?

Year of 2015-2016

b. Have you contacted the provider directly about your complaint? (●) Yes ( ) No

If so, what action (if any) was taken?

Yes I called left several VM. Also E-mailed Her.

c. Did any other provider(s) treat you/patient after the alleged incident? ( ) Yes (●) No

If YES, please specify names and address of other providers:

N/A

d. Have you/patient been treated at any hospitals or urgent care facilities related to this complaint? ( ) Yes (●) No

If YES, please identify the facility name and address as well as the date of treatment

N/A

e. Have you filed this complaint elsewhere? ( ) Yes (●) No

If yes, where?

N/A

What action was or is being taken?

There has been no closure to this action.



# Complaint Form

Revised 9/2017

**5) Please describe your complaint in detail below (use additional paper if necessary):**

I started services at the "Empowerment Clinic" 5257 NE Martin Luther King Jr Blvd Suite 201, Portland, OR 97211. I had Dr. Kimila Jeanae Kent as a mental health specialist in July 2017 to Dec. 2017. I had many assessments with her in regards to my mental health diagnoses and medication treatment. I was promised medication management and counseling at the Clinic. I was told all my worries and past issues with doctors would come to an end with her. It sounded like a dream; however it turned out to be a nightmare. I was given the run around for 6 months. I was promised medication and she never prescribed me anything. All she did was request a blood test that had nothing to do with my mental health program. For 6 months I endured severe mental pain and anguish. She ignored my calls and never responded to my VM or E-mails. I had to go to my primary care at AFC Urgent Care NW: Portland 25 NW 23rd Pl, Portland, OR 97210 503-305-6262 to get bridge medications for mental health. My primary doctor had questions on why I was never receiving medication from my mental health provider Dr. Kimila Jeanae Kent and why she never prescribed me anything ever and they said its quote "concerning". I also had to get medication through Legacy Good Samaritan Medical Center: Emergency Room 1015 NW 22nd Ave, Portland, OR 97210 503-415-5600. The experience from Kimila Jeanae Kent seemed to be unprofessional and feel she deliberately made up fictitious claims for the purpose of defamation of character. I suffered by the hands of horrible doctor that refused to prescribe any medications resulting in personal injury.

Also Broke HIPPA Law – Broke medical client Confidentiality on my sharing my medical info without my consent

**I certify that the above information is true to the best of my knowledge.**

Signature of Complainant [signature] Date 1/28/2019

To submit this complaint to the Board, please print this document and mail it to the Board at the following address:

**Oregon Medical Board**
**1500 SW 1st Ave, Suite 620**
**Portland, OR 97201**



# CONFRONTING CRIMINAL JUSTICE DEBT

## A GUIDE FOR POLICY REFORM

September 2016

CRIMINAL JUSTICE POLICY PROGRAM
HARVARD LAW SCHOOL

© Copyright 2016, Criminal Justice Policy Program at Harvard Law School.
All rights reserved.

ACKNOWLEDGEMENTS

*Confronting Criminal Justice Debt: A Guide for Policy Reform* was prepared by the Criminal Justice Policy Program (CJPP) at Harvard Law School. Substantial research and drafting were contributed by Harvard Law School students Rachel Endick, Zack Greenamyre, Kathleen Heath, and Alexandra Jordan, who participated in the 2015-2016 Criminal Justice Fellows Seminar. The drafting of this guide was overseen by CJPP's executive director, Larry Schwartztol, faculty co-directors, Prof. Carol Steiker and Prof. Alex Whiting, and legal fellow, Anna Kastner. It was undertaken as part of *Confronting Criminal Justice Debt: A Comprehensive Project for Reform*, a collaboration with the National Consumer Law Center. CJPP is grateful for generous insights and feedback from Nick Allen, Jessica Feierman, Heather Hall, Alexes Harris, Thomas Harvey, Alex Kornya, Jan Kruse, Mitali Nagrecha, David Seligman, and Abby Shafroth.

## ABOUT THIS PROJECT

This report is part of *Confronting Criminal Justice Debt: A Comprehensive Project for Reform*, a collaborative project by Criminal Justice Policy Program (CJPP) at Harvard Law School and the National Consumer Law Center (NCLC).

This project includes three parts designed to assist attorneys and advocates working on reform of criminal justice debt:

- *Confronting Criminal Justice Debt: The Urgent Need for Comprehensive Reform* (CJPP and NCLC),
- *Confronting Criminal Justice Debt: A Guide for Litigation* (NCLC), and
- *Confronting Criminal Justice Debt: A Guide for Policy Reform* (CJPP).

For more information, please visit:

Criminal Justice Policy Program at Harvard Law School at: http://cjpp.law.harvard.edu
National Consumer Law Center at: http://www.nclc.org/issues/criminal-justice.html




## ABOUT THE CRIMINAL JUSTICE POLICY PROGRAM

The Criminal Justice Policy Program (CJPP) at Harvard Law School conducts research and advocacy to support criminal justice reform. It generates legal and policy analysis designed to serve advocates and policymakers throughout the country, convenes diverse stakeholders to diagnose problems and chart concrete reforms, and collaborates with government agencies to pilot and implement policy initiatives.

# CONFRONTING CRIMINAL JUSTICE DEBT

# A GUIDE FOR POLICY REFORM

## TABLE OF CONTENTS


1. INTRODUCTION .... 1

*A Two-Tiered Criminal Justice System* .... 1

*Growing Attention to Criminal Justice Debt* .... 3

*Purpose of the Guide* .... 4

*A Note on Terminology* .... 6

2. CONFLICTS OF INTEREST .... 6

*Legislative Reforms* .... 11

Cap the Contribution of Court Revenue to Local Operating Costs .... 11

Fully Fund Courts from State Budgets .... 12

Eliminate Surcharges Imposed on Criminal Defendants .... 12

Remove Perverse Incentives of Private Probation Companies .... 12

Eliminate Fines and Fees That Are Specifically Earmarked for Law Enforcement Agencies .... 13

Eliminate Fines and Fees Imposed Prior to Adjudication of Guilt .... 13

*Judicial Reforms* .... 13

Exercise Supervisory Control Over Local Courts .... 13

Monitor and Eliminate Racial Disparities .... 14

*Executive Reforms* .... 14

Realign Incentives of Private Probation Companies and Private Debt-Collectors .... 14

Disseminate Consumer Protection Information .... 15

3. POVERTY PENALTIES AND POVERTY TRAPS .... 15

*Legislative Reforms* .... 16

Abandon Reliance on Poverty Penalties .... 16

End the Use of Collection Mechanisms That Act as Poverty Traps .... 17

Encourage Fair Collection Practices .... 17

Scale Debts Based on Ability to Pay .... 19

Authorize Alternatives to Monetary Sanctions .... 20

De-link Debt and Reentry . . . . . 22
Create Amnesty Programs . . . . . 23
*Judicial Reforms* . . . . . 24
Amend Court Rules . . . . . 24
Create Diversion Courts . . . . . 25
*Executive Reforms* . . . . . 25
Exercise Authority Over Collection Agencies . . . . . 25
Monitor Civil Rights Consequences . . . . . 26

4. ABILITY-TO-PAY DETERMINATION . . . . . 26
*Legislative Reforms* . . . . . 27
Codify Critical Elements of Ability-to-Pay Proceedings in State Law . . . . . 27
Amend or Repeal Facially Unconstitutional Statutes . . . . . 29
Eliminate Presumptions of Ability to Pay Criminal Justice Debt . . . . . 30
*Judicial Reforms* . . . . . 30
Provide Judicial Education . . . . . 30
Create Standard Forms . . . . . 31
Conduct Periodic Audits . . . . . 31
Take Enforcement Actions . . . . . 31
*Executive Reforms* . . . . . 31
Disseminate Information to the Public . . . . . 31
Issue Clarifying Legal Opinions . . . . . 31
Conduct Audits and Monitor Compliance . . . . . 32

5. TRANSPARENCY AND ACCOUNTABILITY . . . . . 32
*Legislative Reforms* . . . . . 33
Collect and Publish Data on Criminal Justice Debt . . . . . 33
Establish a Commission to Review Existing and Proposed Fines and Fees . . . . . 34
Include Fiscal Impact Statements in New Legislation . . . . . 35
Expand Public Records Laws to Include Revenue and Collection of Court Debt . . . . . 35
Require that Criminal Justice Debt Statements Be Issued to Defendants . . . . . 35
Collect and Publish Data on Private Probation or Debt-Collection Companies . . . . . 36
*Judicial Reforms* . . . . . 37
Issue Rules Requiring that Warrants Indicate the Reason for their Issuance . . . . . 37
Make Information Accessible Online . . . . . 37
Use Judicial Directives to Clarify Which Fees Are Discretionary . . . . . 37
*Executive Reforms* . . . . . 38
Audit Courts . . . . . 38

6. MOVING AHEAD . . . . . 38

ENDNOTES . . . . . 39

# 1. INTRODUCTION

## A Two-Tiered Criminal Justice System

Across the country, onerous fines and fees pose a fundamental challenge to a fair and effective criminal justice system. By disproportionately burdening poor people with financial sanctions, and by jailing people who lack the means to pay, many jurisdictions have created a two-tiered system of criminal justice. Unchecked, these policies drive mass incarceration. Excessive fees and fines needlessly enmesh poor people in the criminal justice system by spawning arrests, court proceedings, periods of incarceration, and other modes of supervision for those who lack the ability to pay. Criminal justice debt also contributes to mass incarceration by destabilizing people living at the economic margins and by impeding reentry of formerly incarcerated people who face impossible economic burdens, leading to cycles of poverty and imprisonment.[1]

Monetary sanctions often serve purposes that have nothing to do with advancing the values typically associated with criminal justice. Although *fines* are designed to act as punishment or a deterrent, *fees* do not advance the traditional purposes of the criminal justice system. Rather, fees are often authorized by state legislatures as a means to generate revenue to fund courts or other government functions without raising taxes. In many jurisdictions, court costs and surcharges fund the agencies responsible for imposing fees and fines on individuals.[2]

Though court debt is often justified as a means of shifting the costs of the criminal justice system to those who "use" that system, that justification is flawed: the legal system is a public good that benefits *all* members of the community and thus should be funded from general revenue. Moreover, funding the court system through monetary sanctions can create pressure to raise increasing revenue through the courts. When states and localities use courts to fill gaps in their budgets, this leads to perverse incentives and erodes public trust in the judicial system.[3]

The financial and social costs associated with criminal justice debt have had a disparate impact on the poor and people of color.[4] Several factors drive these disparities. Among other things, when minor violations, such as driving with an expired registration or having an open container of alcohol, are disproportionately enforced in Black or Latino communities, these concentrated encounters with law enforcement lead to racial disparities in the imposition of fees and fines. More broadly, structural factors that lead to racial disparities throughout the criminal justice system[5] will generate uneven enforcement of fees and fines. And because race intersects with class,[6] with Black and Latino families disproportionately facing poverty, fees and fines that impose special hardships on impoverished individuals and communities will reinforce racially unequal outcomes.

When protests erupted in Ferguson, Missouri, after a police officer shot and killed Michael Brown, the Department of Justice's investigation revealed troubling practices by local authorities. The Ferguson Report vividly described how the municipality used its court system to generate revenue in a way that disproportionately burdened African Americans. The imperative to raise revenue was pervasive: one local official asked the chief of police to increase ticketing for traffic and minor ordinance violations in response to "a substantial sales tax shortfall."[7] At the same time, policing and court practices in that jurisdiction had a disparate impact on African Americans residents – not only were African Americans stopped and searched by police at a higher rate than other residents, but they were also more likely to be issued multiple citations, have their cases persist for longer, face more mandatory court appearances, and have warrants issued for failing to meet court-ordered obligations.[8] African Americans were also more likely to be issued citations that involved a high degree of discretion by local law enforcement. Although 67% of Ferguson residents are Black, African Americans received 95% of the Manner of Walking in Roadway charges and 94% of Failure to Comply charges.[9]

The Ferguson Report highlighted the way that policing practices and routine courtroom procedures led African Americans to face higher fines, more warrants for failing to pay criminal justice debt, and greater exposure to the criminal justice system, but these problems are not unique to Ferguson. A recent California study found "statistically significant racial and socioeconomic disparities," in traffic stops, license suspensions for failure to pay criminal justice debt, and arrests for driving with a suspended license.[10] These disparities are reflected in practices around the country.[11]

In addition to these profound consequences for the fairness of the legal system, policies for imposing and enforcing criminal justice debt often do not make financial sense. One of the reasons for the proliferation of criminal justice debt is the perception by many policymakers at all levels of government that financial sanctions are necessary to fund the criminal justice system.[12] For reasons described in greater detail below, the dependence of courts and other government actors on criminal justice debt is itself part of the problem. It can distort governmental decision-making in individual cases by creating conflicts of interests when judges, police officers, or other criminal justice actors make decisions driven by revenue-raising considerations. This can also create a vicious cycle, where courts, jails, probation agencies, and others whose budgets draw from these revenue streams worry about the consequences of reducing the flow of court-generated revenue. Faced with these pressures, legislatures may resist policy changes that remove a major funding mechanism.

But the perceived benefits of relying on revenue generated from criminal defendants are often illusory. Most states do not collect data on criminal justice debt at all. If they

do, they only look at the amount of revenue collected without measuring the cost of collection or the burdens on the justice system that follow from aggressive enforcement of criminal justice debt.[13] As a result, even from a purely fiscal perspective, criminal justice debt may not provide jurisdictions with net economic benefits. Moreover, as a method of funding government, fines and fees act as a regressive tax, with those who can least afford to pay facing the greatest liabilities. And jailing people for non-payment of debt that they are too poor to afford violates the Constitution, a consideration that has inherent weight and that also imposes yet another layer of financial costs: jurisdictions across the country have faced expensive lawsuits for jailing people who are unable to pay criminal justice debt.[14]

Because a well-functioning justice system generates broad-based social benefits, funding that system should be prioritized through ordinary budgetary processes rather than reliance on financial obligations enforced by courts or police. Yet the perceived necessity of deriving revenue through criminal justice debt raises a cautionary note for reformers: solutions that eliminate real or perceived funding streams for important governmental functions will have to include viable fiscal alternatives.

## Growing Attention to Criminal Justice Debt

Criminal justice debt—and the unjust and inefficient outcomes it can spawn—has gained increasing attention in recent years. Advocacy groups have done important work to reveal how criminal justice debt leads to people being jailed based on their poverty, impedes the reentry of people released from incarceration, ensnares indigent defendants in deeper cycles of poverty, and perpetuates costly and inefficient practices throughout the justice system.[15] Legal scholars and social scientists have conducted empirical research on the scale of the problem and the structural consequences of improper use of criminal justice debt.[16] A string of civil rights lawsuits throughout the country has highlighted the problem, telling vivid stories of individual injustice, exposing unconstitutional practices, and spurring local reforms.[17] The federal government has also pressed for systemic policy changes at the state and local level.[18]

This expanding coalition of advocates, researchers, and government actors has created an environment ripe for reform. Monetary sanctions are ubiquitous in the criminal justice system, and the harms they impose can be deeply entrenched. But recent efforts by a broad range of actors have shined a spotlight on these problems. This guide is intended to support advocates and policymakers seeking to translate this new momentum into meaningful policy reforms.

## Purpose of the Guide

This guide is intended for advocates and policymakers working at the state level to cure the harms associated with criminal justice debt. It outlines approaches that may be directed at numerous statewide actors: legislatures, chief judicial officers or judicial administrators, and executive agencies. Not every approach outlined here is designed to be used in every context—rather this guide identifies the kinds of harmful practices that should be targets of reform and outlines proposed policies that might be implemented. It should be seen as a toolkit: Policymakers and advocates should select specific reforms based on the existing practices in their state and the different opportunities afforded by particular institutional actors.

In setting out potential avenues of reform, this guide focuses on changes that can be implemented on a statewide basis. It is crucial to recognize, however, that the problems associated with criminal justice debt are often intensely local:[19] conflicts of interest may arise when municipalities depend on fees and fines for local revenue; local actors may develop their own approaches to imposing financial sanctions, through a combination of formal policy and unwritten practice; local police departments may structure their enforcement priorities with a view toward revenue-raising, often resulting in racial disparities; and laws applying procedural safeguards may be inconsistently implemented in different courtrooms across a state or even within a particular jurisdiction. Advocates or policymakers in any particular state must be alert to these local dynamics.

This guide focuses on statewide mechanisms of reform, rather than changes geared toward counties, municipalities, or individual courthouses, for three related reasons. First, even where local practices vary, in most cases the underlying legal authorities for imposing and enforcing debt will be rooted in state law. Second, working locality-by-locality to address problems on a hyper-local basis may prove Sisyphean—the process of investigating each local entity, devising reforms, and having them enacted is far too time-intensive to realistically allow for reform in every locality that warrants it. (For example, St. Louis County—which has become a national focal point with respect to criminal justice debt—consists of 90 individual municipalities.[20]) Third, the existence of such local variation suggests that exclusively local reform may not prove durable—the same dynamics that have caused localities to undertake their own practices in the past may lead to drift in the future unless there are strong mechanisms to ensure uniform best practices. For these reasons, this guide focuses not only on how to put in place appropriate statewide legal norms, but also on how to create mechanisms for institutionalizing consistent application of those norms across a state.

This guide is organized around four overarching areas of potential reform. For each area, it provides an overview of the issue as well as several reform strategies that might be implemented through legislation, court rules, or executive action. The four areas are:

- Conflicts of interest: One of the most unsettling revelations in the Justice Department's Ferguson investigation was the deep and pervasive conflicts of interest facing actors throughout that city's criminal justice system. Simply put, municipalities and courts used fees and fines, enforced by the coercive power to of the criminal justice system, to secure government revenue. These financial incentives drove the system's approach to law enforcement. Such conflicts of interest are not unique to Ferguson. Throughout the country, courts and other government actors face pressure to bring revenue into their own operating budgets through the imposition and enforcement of criminal justice debt. These incentives distort outcomes and undermine the public's faith in the system. This guide outlines several approaches for eliminating those conflicts of interest.

- Poverty penalties and poverty traps: Criminal justice debt, and the elaborate enforcement machinery often used to collect it, can have spiraling consequences for the most economically marginalized individuals. In some instances, enforcement of these obligations has the paradoxical effect of constraining an individual's ability to earn a living, thus undercutting the person's ability to pay court costs while ensnaring her and her family in a cycle of poverty and indebtedness. Other policies attach cascading costs and penalties to the collection practices geared toward indigent defendants, creating a situation where the poor systematically pay more. This guide discusses how to identify policies that operate as poverty traps or penalties and proposes reforms that would reverse those effects.

- The ability-to-pay determination: Too often, courts impose financial obligations that are simply beyond a defendant's capacity to ever meet. Constitutional law prohibits jailing defendants for non-payment of debts they cannot afford, which means courts must make an inquiry into a person's ability to pay *before depriving them of liberty for non-payment.* Sound policy considerations counsel in favor of robust procedures for conducting such determinations not only at the enforcement stage but also when financial obligations are imposed. This guide outlines the baseline constitutional requirements and describes several best practices for ensuring such determinations are efficient and fair.

- Transparency and accountability: All of the reform strategies outlined in this guide will benefit from robust transparency measures that allow policymakers, advocates, researchers, journalists, and individual criminal defendants to understand exactly how court debt operates. Transparency in this context means laws designed to ensure data collection by government actors about the functioning of court debt (including its racial impact), analysis and disclosure of system-wide practices, and opportunities for individuals to request and receive documents reflecting policies and practices relating to criminal justice debt.

### A Note on Terminology

For purposes of clarity and simplicity, the array of financial obligations that accompany encounters with the criminal justice system are referred to collectively as "criminal justice debt."[21] Scholars and advocates have also referred to these obligations as "legal financial obligations (LFOs),"[22] "monetary sanctions,"[23] or just "fines and fees."[24] Some advocates refer to the impact of these fine and fees as "debtors' prisons" or "modern-day debtors' prisons."[25]

Additionally, at various points, this toolkit will discuss specific types of criminal justice debt in greater detail. Relevant terms are set out below:

- *Fines* are financial obligations imposed as a penalty after a criminal conviction or admission of guilt to a civil infraction.
- *Fees* (or *user fees*) are financial obligations imposed as a way for jurisdictions to recoup costs of the "use" of the criminal justice system, including costs associated with public defenders, incarceration, probation supervision, GPS monitoring, and court proceedings.
- *Surcharges* are financial obligations, either a flat fee or a percentage added to a fine, imposed to fund a particular government function or a general fund.
- *Interest and penalties* are financial obligations and additional costs that accrue based on staggered payment plans, late payment, or non-payment of criminal justice debt.
- *Restitution* refers to financial obligations intended to compensate victims of a crime for their actual losses. Restitution is typically understood to consist of money actually transmitted to individual victims of crime, but in some instances it is in fact paid to government-run victims' funds or to reimburse government agencies or insurance companies.

## 2. CONFLICTS OF INTEREST

The dependence of courts and other government agencies on revenue derived from criminal defendants can generate profound conflicts of interest. Individual decision-makers throughout the criminal justice system operate according to incentives that may encourage unnecessarily harsh outcomes for criminal defendants. This dynamic is especially pronounced where there is a direct link between a criminal justice agency—a court system, police department, prosecutors' office, or probation department—and the flow of revenue derived from fees or fines. In such instances, individual case outcomes may be driven by the desire to raise revenue, with the most severe consequences for defendants who are least able to afford those financial sanctions. The effects of these conflicts

of interest extend beyond individual cases. They can undermine the legitimacy of the justice system by supporting the perception that the legal system privileges budgetary imperatives over the needs of justice. Such diminished legitimacy will be compounded when these conflicts of interest are perceived as driving racially disparate outcomes.

Conflicts of interest surrounding criminal justice debt also distort governmental decision-making more broadly. Where courts and other justice system actors fund their operations through revenue extracted from a subset of the population, broader decisions about the size and scope of the criminal justice system will evade the normal budget-making process and the checks and balances that process imposes.

## CASE STUDY

### LOUISIANA JUDICIAL EXPENSE FUNDS[26]

In Louisiana, municipal,[27] civil,[28] criminal,[29] traffic[30] and juvenile[31] courts operate judicial expense funds. Judges may impose costs payable to the judicial expense fund in a range of circumstances, including when a defendant is convicted after a trial,[32] pleads guilty, forfeits bond, or posts bond with a commercial surety.[33]

Judicial expense funds are controlled by judges of the court en banc.[34] Judges have wide discretion over how the funds are spent. Municipal and traffic court judges have discretion to use the funds for "any expense of the court," including any operating expenses.[35] Criminal district courts have even wider latitude, with the ability to use the funds for "any purpose connected with" or "incidental to" the court.[36] The only restriction on spending is that judges may not pay their own salaries from the funds.[37]

On a number of occasions, money from judicial expense funds has been used to pay for luxury goods or items, including supplemental health insurance for judges, two Ford Expeditions, a leather vehicle seat upgrade for a take-home vehicle, and a full time private chef.[38]

In 1991, a federal district court held that surcharges on bail bonds that were paid into the Judicial Expense Fund were unconstitutional.[39] The court held that the complete control exercised by the judges "plainly creates a temptation for the judges to forego due process and assess high bail amounts in order to maintain the level of funding necessary to run their respective criminal justice systems."[40]

Despite this ruling, the practice of raising revenue for judicial expense funds through imposing fees and surcharges on criminal defendants continues. In 2015, a civil rights organization filed litigation to challenge the constitutionality of this scheme.[41]

Most starkly, unconstitutional conflicts of interest exist when a decision-maker with the power to arrest, charge, convict, or sentence a defendant would personally benefit as a result of exercising that power.[42] Conflicts of interest can also arise in the absence of such a direct personal conflict where judicial and executive powers are intermingled.[43]

Conflicts of interest also emerge when raising revenue becomes a dominant aim of the criminal justice system and when actors in the system are forced to rely on fines, fees, and surcharges for funding. Political pressure to raise more revenue may be transmitted within a branch of government (such as when a mayor's office places pressure on a police chief to issue more tickets) or between branches of government.[44] In Ferguson, Missouri, police and court officials were found to have "worked in concert to maximize revenue at every stage of the enforcement process,"[45] in disregard of the rights or wellbeing of the people of Ferguson—particularly those who were poor and Black.

## CASE STUDY
### SUPREME COURT OF MISSOURI, MUNICIPAL DIVISION WORK GROUP

In the aftermath of Michael Brown's death and the attention that was paid to Ferguson, the Missouri Supreme Court in 2015 convened a Municipal Division Work Group to identify reforms that the court could make to address conflicts of interest, as well as broader issues related to criminal justice debt. The group conducted three public hearings across Missouri and relied on a number of reports from advocacy organizations and governmental agencies.[46] The Work Group released its findings and recommendations in March 2016, which included the following:

- To address personal conflicts of interest, the majority of the Work Group recommended that the Supreme Court of Missouri adopt a rule prohibiting part-time municipal judges from serving as prosecutors or defense attorneys in the same county,[47] and prohibiting attorneys from serving as both prosecutors and defense attorneys in the same county.[48]
- To address structural conflicts of interest, the Work Group recommended that the revenue received from fines and penalties for municipal ordinance violations should be directed to the state's school funds.[49]
- The Work Group also emphasized that court costs, fees, and surcharges could be used to recoup reasonable court expenses, but should not be directed to law enforcement or other core government functions. Rather, the state legislature should give municipalities sufficient taxing power to fund law enforcement through general taxes.[50]

There has been a trend towards placing the burden upon the judiciary to generate enough revenue to cover their operating costs, through retained revenue from fines, fees, or other assessments.[51] As the majority of the budget in most court pays for salary and personnel costs, many courts have perceived an imperative to raise more funds through fines and fees.[52] Indeed, a survey of fifteen states found that most had increased the types of fees and the dollar amounts of each fee during the first decade of the 2000s.[53]

> Criminal justice debt can undermine the legitimacy of the justice system by supporting the perception that it privileges budgetary imperatives over the needs of justice. Such diminished legitimacy will be compounded when these conflicts of interest are perceived as driving racially disparate outcomes.

Along with requiring courts to generate revenue for their own operations, in some states there are expectations that the courts will be a "collection agency [funding] executive branch services."[54] In some instances, these surcharges are earmarked for a specific purpose which bears a relationship to the offense committed—for example, where the offense of driving under the influence carries a fee that is earmarked for a head and spinal cord injuries family-support program.[55] In other instances, the money is distributed for a range of purposes only loosely connected with the justice system. For example, in 2012 Tennessee legislators passed a measure imposing a $450 criminal record expungement fee, which was widely understood as a revenue-raising mechanism to serve the state's general budget.[56] Although the measure was intended to generate $7 million per year, it has only raised an average of $130,000 annually due to the high fee.[57] Surcharges are, in effect, a regressive tax imposed on criminal defendants.

## CASE STUDY
### TENNESSEE "PRIVILEGE" TAX

Tennessee law imposes a "privilege tax" upon conviction for many crimes.[58] The disbursement of the privilege tax demonstrates the manner in which this surcharge acts as a revenue source for many areas of government. The privilege tax is disbursed as follows:[59]

- 0.0320%—fund established for the operation of the Tennessee corrections institute
- 4.4430%—departments of education (75%) and department of safety (25%), to promote and expand driver education through the public schools of the state, and to promote safety on the highways
- 32.1502%—general fund
- 0.6553%—state court clerks' conference
- 0.8406%—victims of crime assistance fund
- 24.0020%—criminal injuries compensation fund
- 1.3755%—victims of drunk drivers compensation fund
- 3.7653%—compensation/salaries of attorneys other than public defenders and post-conviction defenders
- 0.5529%—administrative director of the court, to be used to defray the expenses of serving the general sessions courts and the Tennessee general sessions judges' conference
- 19.2902%—public defender program
- 7.4701%—civil legal representation of indigents fund
- 2.3506%—earmarked for grants to local governments for the purchase and maintenance of and line charges for electronic fingerprint imaging systems
- 0.3426%—sex offender treatment fund
- 2.7747%—department of education to promote and expand driver education

While the conflicts of interest described above predominately involve governmental actors, the privatization of criminal justice functions may also lead to conflicts of interest. The role of private companies in two areas merits special attention: probation and debt-collection.

In many jurisdictions that have privatized probation supervision, probation companies derive income solely from the fees that they charge probationers. This "offender-funded" model creates perverse financial incentives for private probation companies to keep individuals on probation for as long as possible. Companies are incentivized to

urge judges to impose additional conditions that carry financial costs and to request that courts sentence defendants to consecutive, rather than concurrent, terms of probation.[60] Advocates and journalists have documented these dynamics in jurisdictions across the country.[61] For example, in Mississippi, a woman was charged a $377 fine for driving without a valid license, but her probation supervision fees, including a fee for electronic monitoring, totaled almost $300 per month. When she fell behind on payments, the probation officer threatened to have her arrested—potentially resulting in the loss of child custody—even though she had already paid the fine to the court and her only outstanding debt was owed to the probation company.[62]

Similarly, many states permit the assignment of criminal justice debt to private debt-collectors.[63] Those agencies often derive income directly from the fees that they charge to defendants.[64] Florida and Tennessee, for example, allow private debt collection firms to add up to a 40 percent surcharge on unpaid criminal justice debt.[65] These incentives may encourage abusive practices by debt collectors. The consequences of these perverse incentives are exacerbated when private debt collectors are delegated decision-making powers with little government oversight. In Iowa, for example, the private debt collector may be the final arbiter as to when an individual is in default and what is a reasonable payment to remove a license or registration hold on a delinquent debt.[66]

This section outlines a range of reforms intended to untangle the conflicts of interest affecting a state's criminal justice system.

## Legislative Reforms

### *Cap the Contribution of Court Revenue to Local Operating Costs*

States should cap, and over time lower, the percentage of revenue that municipalities or other localities can derive from the courts. A cap insulates courts and law enforcement bodies from local political pressures to continue increasing revenue to supplement the activities of the legislative and executive branches. The reform may need to be accompanied by legislation granting municipalities or localities sufficient taxation authority to provide a more appropriate and stable revenue base for local governments.[67]

This reform was enacted recently in Missouri.[68] Every county, city, town, and village is required annually to calculate "the percentage of its annual general operating revenue received from fines, bond forfeitures, and court costs for minor traffic violations."[69] If the percentage exceeds 20% (or 12.5% in St. Louis County), then the excess amount is sent to the Missouri Director of the Department of Revenue, which distributes money to the schools of the county. Passing the revenue to a different level of government reduces the intensity of local political pressures. The law was subject to criticism for being under-inclusive. Specifically, it didn't cap revenue raised from housing code

violations or other non-traffic violations, which in some municipalities are more than half the charges imposed.[70] In January 2016, Missouri passed a new bill limiting revenue from non-traffic ordinance violations.[71]

In Oklahoma, if a municipal law enforcement agency is determined to be conducting law enforcement practices for the purpose of generating more than 50% of the revenue needed for the operation of the municipality, the State Commissioner of Public Safety can issue a notice preventing that agency from regulating traffic and enforcing traffic-related statutes or ordinances on state highways.[72] Revenue caps have also been imposed in Virginia[73] and Florida.[74]

*Fully Fund Courts from State Budgets*

To avoid creating incentives for courts and localities to fund themselves based on criminal justice debt, the judicial system should be fully funded by the state. [75] Funding courts out of general revenue reflects the important principle that courts are an equal branch of government and essential to the common welfare, not a user-pays service provider. As the Conference of State Court Administrators has explained: "The benefit derived from the efficient administration of justice is not limited to those who utilize the system for litigation, but is enjoyed by all those who would suffer is there was no such system—the entire body politic."[76] This means funding court operations from a state's general budget. However, the feasibility of this model may depend on the organization of courts—particularly whether the state has a unified judicial system[77]—and on constitutional restraints on funding models.[78]

*Eliminate Surcharges Imposed on Criminal Defendants*

As discussed above, surcharges improperly use the courts as a substitute taxation system. By tacking additional financial obligations onto criminal sentences that fund the general functioning of government, but do not serve any traditional criminal justice function, surcharges will typically operate as regressive taxes. Yet surcharges are a poor form of budgetary management. Earmarked funds escape the priority-setting processes of legislative budgets.[79] Surcharges should be eliminated and government spending should be determined through the ordinary budgetary processes.[80]

*Remove Perverse Incentives of Private Probation Companies*

The criminal justice system should not engage private probation companies on terms that tie a company's profits to the financial obligations shouldered by probationers or the length of time individuals remain under supervision. To the extent private probation companies operate under "offender-funded" business models, the potential for conflicts of interests are too significant to tolerate and state law should ensure that such conflicts of interest are eliminated. If private companies are hired to supervise

probation, legislatures should realign the companies' incentives to ensure that they are compensated based on positive outcomes, such as ensuring that probationers avoid re-incarceration. Where private probation is authorized, states should also abolish supervision fees.[81]

### *Eliminate Fines and Fees That Are Specifically Earmarked for Law Enforcement Agencies*

In many states, funds collected from criminal defendants are earmarked for law enforcement.[82] For example, a statute in Tennessee that establishes mandatory minimum fines for certain drug offenses, ranging from $250 to $5000, provides that 50% of the amount collected "shall be paid to the general fund of the governing body of the law enforcement agency responsible for the investigation and arrest which resulted in the drug conviction."[83] This direct link between policing and revenue generation may lead police agencies to prioritize enforcement in ways that may do little or nothing to advance public safety but that drive up policing budgets.[84] State law should eliminate these conflicts.

### *Eliminate Fines and Fees Imposed Prior to Adjudication of Guilt*

A number of states have legislation that provides for the imposition of fines or fees prior to an adjudication of guilt. Examples include:

- Pre-trial diversion fees, where prosecutors are able to collect fees from defendants for probation-like supervision in exchange for the suspension of criminal proceedings;[85]
- Pre-trial abatement schemes, where defendants can pay an amount to the police or courts to have charges dismissed or adjudication stayed;[86]
- Booking fees;[87] and
- Civil forfeiture actions.[88]

Prior to trial, the discretion of a police officer or a prosecutor is not supervised in any way by the courts, nor challenged by a defense attorney.[89] Yet pressure to raise revenue through such obligations may be especially acute. Accordingly, fees imposed at these early stages of the criminal process should be eliminated.

## Judicial Reforms

### *Exercise Supervisory Control Over Local Courts*

It is common for a chief justice or presiding judge to be vested with administrative oversight authority over lower courts in their state or region.[90] Higher courts are more removed from the conflicts of interest affecting local or municipal courts. These courts should audit the performance of inferior courts, including municipal courts, to

determine whether they are complying with existing law, recommend best practices, and assist or even temporarily manage failing or dysfunctional courts.[91]

Closer supervision of municipal courts has been a reform goal in Missouri, with the Missouri Supreme Court Municipal Division Work Group recommending the creation of full-time professional staff positions in the Circuit Court of St. Louis County to assist the Presiding Judge with supervision duties. The proposed role of those staff members is "to make frequent scheduled and unannounced visits to the municipal courts, to review their records and practices with the municipal judges and clerks, to observe the courts in session, to evaluate whether the municipal courts are complying with Missouri statutes and supreme court rules, and to report any observed deficiencies to the Presiding Circuit Judge for individualized attention as required."[92]

### *Monitor and Eliminate Racial Disparities*

One of the lessons of the Justice Department's Ferguson investigation is that deeply entrenched conflicts of interest can interact with overt and implicit bias, resulting in discriminatory practices designed to raise revenue. Acting in their supervisory capacities, chief justices and chief judges should take active steps to eliminate these disparities. This should include, at a minimum, data collection and analysis designed to spot unwarranted racial disparities and training on implicit bias for judges and prosecutors involved in the imposition and collection of criminal justice debt.

## Executive Reforms

### *Realign Incentives of Private Probation Companies and Private Debt-Collectors*

When private companies perform functions related to the imposition or enforcement of criminal justice debt, agencies contracting with them should actively structure contracts to establish proper incentives. Some states have begun to move towards a "performance incentive" funding model in other criminal justice contexts. In Pennsylvania, for example, the Department of Corrections initiated performance-based incentive programs for halfway houses contracted by the state.[93] Private operators who lowered recidivism rates were rewarded, while those who failed to do so had their contracts revoked. In Illinois and California, probation agencies were rewarded with a share of prison cost savings when they revoked fewer probationers to prison for violations.[94] In California, as of 2011, the state saved $278 million in prison costs and reduced probation revocations by nearly one-third.[95] In Illinois, the program cut participant recidivism by as much as one-fifth.[96] Applied to private probation companies and debt-collectors, performance incentive models would require robust oversight mechanisms to monitor the performance of private companies and provide the data to which incentives can be tied.[97] It is crucial to ensure that these companies are not incentivized to use inappropriately

coercive collection tactics. This will likely mean eschewing contracts that tie a company's profits to the amount of debt it extracts and instead linking compensation to more fundamental goals of the criminal justice system, such as successful completion of probation and reduction of recidivism.

*Disseminate Consumer Protection Information*

In many states, the attorney general will maintain responsibility for enforcing consumer protection laws. These laws will typically reflect the principle that debt-collection should not be unduly coercive, especially where vulnerable individuals are involved. State attorneys general should publish know-your-rights information via the Internet and other accessible media outlets to inform individuals subject to criminal justice debts of their rights against unfair or unlawful debt-collection practices.

## 3. POVERTY PENALTIES AND POVERTY TRAPS

As states and municipalities have looked for revenue sources without resorting to raising taxes,[98] the burden of criminal justice debt has become significantly more onerous for poor Americans than for those with means.[99] The poor pay more not simply because they are more often targeted for enforcement,[100] or because many infractions—such as sleeping in public places[101] or failing to maintain auto insurance[102] or selling loose cigarettes[103]—criminalize poverty. Poor people pay more than those with means simply because of the fact of their poverty.[104]

A "poverty penalty" exists when a poor person is punished more severely than a wealthier person for the same infraction as a direct consequence of her poverty. It may take a variety of forms: late fees, which can vary from a fixed amount[105] to a percentage of the debt owed;[106] costs of collection;[107] interest charges;[108] fees to enter installment plans;[109] the issuance of arrest warrants (with associated fees);[110] fines for contempt of court;[111] jailing for contempt of court; and the imposition or extension of probation (with associated fees)[112] until the debt is paid in full. These penalties amount to additional punishment due to a defendant's poverty.

A "poverty trap" is a policy that not only punishes the poor more severely, but keeps a person in poverty by inhibiting his or her ability to make a living or meet basic needs and obligations. For example, making payment of criminal justice debt a condition of probation or parole acts as a poverty trap when it results in the denial or termination of public benefits, such as food stamps, social security, and housing assistance.[113] The suspension of a driver's or professional license is one of the most pervasive poverty traps for poor people assessed a fine that they cannot afford to pay.[114] The practice is widespread.[115] Nearly 40% of license suspensions nationwide stem from unpaid fines,

missed child support payments, and drug offenses—not from unsafe or intoxicated driving or failing to obtain automotive insurance.[116] Suspension of a driver's or professional licenses is hugely counterproductive; it punishes non-payment by taking away a person's means for making a living.[117] License suspension programs are also expensive for states to run[118] and they distract law enforcement efforts from priorities related to public safety.[119] License suspensions may also be unconstitutional if the license was suspended before the judge determined the defendant had the ability to pay the criminal justice debt.[120]

Poverty penalties and traps are bad public policy. Poverty penalties are often simply uncollectable and lead to cycles of debt and poverty.[121] These practices often lead to incarceration and give rise to new exposure to the criminal justice system due to probation violations or driving with a suspended license.[122] Poverty penalties and traps cost the state money in unnecessary enforcement costs and result in large amounts of debt going uncollected.[123] Given the often draconian consequences of non-payment of criminal justice debt, in some cases family members or friends may pay a defendant's debt, extending punishment from the defendant to others in a way that undermines deterrence and exacerbates a community's poverty.[124] Criminal justice debt can also act as a barrier to reentry for those leaving jail or prison.[125]

This section outlines reforms designed to reduce the disproportionately harsh impacts that criminal justice debt can have on the poor simply by virtue of their poverty, and to increase the fairness of criminal justice debt collection practices more broadly.

## Legislative Reforms

### *Abandon Reliance on Poverty Penalties*

States should abandon reliance on poverty penalties. Specifically, state legislatures should enact policies:

- Requiring courts to conduct an ability to pay assessment before levying penalties for non-payment, as discussed in greater detail in Part IV;
- Prohibiting the imposition of additional interest or other costs for payment plans for those with the inability to pay the full amount;
- Eliminating interest fees, late fees, collection agency referral fees, and other penalties incurred during a period of incarceration;
- Allowing individuals to obtain hardship deferments—such as freezing interest and penalties or permitting deferral of payments—during a period of financial hardship.[126]
- Ensuring that ability to pay determinations consider all court ordered obligations that defendants are required to pay.[127]

*End the Use of Collection Mechanisms That Act as Poverty Traps*

This guide does not take a position on whether collection methods such as wage garnishment, bank account freezes, barriers to vehicle registration, and diversion of tax refunds are appropriate sanctions for those who are able, but unwilling, to pay criminal justice debt. For those unable to pay, however, such aggressive collection tactics can lead to broader financial crises, including job loss, inability to pay other bills, and eviction—destabilizing events that push people deeper into poverty.[128] These mechanisms should be used minimally, and only when subject to strict ability-to-pay determinations to ensure that they are not directed at individuals who are unable to afford court-imposed financial obligations. Additional poverty traps, such as linking probation terms to payment of criminal justice debt or suspending driver's and professional licenses are discussed in greater detail below:

**Poor people pay more than those with means simply because of the fact of their poverty.**

- Linking Probation Terms to Payment of Criminal Justice Debt

Probation should never be imposed or extended solely as a way to collect debts. States should conserve resources—allowing probation officers to spend their time with probationers who need their attention and reducing the number of persons arrested and hauled into court for technical violations arising out of an inability to pay criminal justice debt.[129] For example, Virginia commissioned a task force comprised of stakeholders from across the criminal justice system to study alternatives to incarceration; among other things, the task force recommended making it easier for defendants to leave supervised probation where the only reason the defendant remained on supervised probation was non-payment of fines and fees.[130] Similar policies can ensure that probation does not become a poverty trap.

- Suspending Driver's and Professional Licenses

Lawmakers should discontinue the use of driver's license suspensions as a penalty for failing to pay criminal justice debt, at least where a defendant is unable to pay.[131] If such licensing is premised on keeping the public safe, suspensions should be tailored to promote public safety not to facilitate debt-collection.[132] Similarly, states should not authorize suspension of professional licenses on the basis of non-payment of criminal justice debt.[133]

*Encourage Fair Collection Practices*

Aside from abolishing poverty penalties and poverty traps, state statutes should be amended to encourage smart and fair collection practices. These practices may include:

- Caps on the percentage of income that can be collected. Lawmakers should cap the amount of a defendant's take home pay that can be collected. Policy advocates have

suggested that there is a "tipping point" where the amount of debt collection becomes counterproductive to a defendant's stability and leads to reoffending; some studies on child support cite 20 percent of take-home pay as this "tipping point."[134] Another well-established method for determining "discretionary income" comes from the student loan repayment context. "Discretionary income" in that context is defined as income in excess of 150% of the federal poverty line and reasonable and fair monthly payments are 10% of this discretionary income.[135] For these caps to be effective, it is crucial that jurisdictions conduct robust ability-to-pay determinations. As discussed in more detail in Section 4, courts should define the relevant financial information courts take into account. These determinations are necessary to ensure that courts and other decision-makers have a full picture of a person's financial obligations so that court debt does not exceed a reasonable tipping point.

- Reasonable and fair payment plans. State legislatures can incentivize people who owe criminal justice debt to satisfy their obligations over time. For example, for debtors who enroll in reasonable and affordable payment plans tied to their income, courts could incentivize consistent compliance. Incentives could range from a waiver of interest charges or waiver of the principal owed after a certain length of compliance[136] to certificates of good conduct,[137] which might make a person eligible for privileges that would have been withdrawn upon a conviction for certain offenses. Payment plans should have no minimum payment amount.
- Ensure that government plays by the same rules as private debt-collection agencies. If it would be illegal for a private debt collector to engage in a certain practice—such as charging punitive fees or using unduly coercive means—so too it should be impermissible for the government to do the same.[138] This reform may require states to impose caps on the amount of interest and collections fees government could charge.[139] States should also enact policies that prohibit aggressive wage garnishment of indigent persons with criminal justice debt.[140]
- Create statutes of limitation for debt collection. When the amount owed by a debtor becomes difficult to determine and verify due to poor recordkeeping or the passage of time, debts should be terminated. For example, the city of Philadelphia decided to end a campaign to collect court debt issued prior to 2010 after advocates showed that the records were unreliable and that indigent defendants would be unable to pay much of the outstanding debt.[141] In the federal criminal justice system, outstanding fines are waived 20 years after imposition, or 20 years after someone is released from prison,[142] and special assessment fees expire if they are unpaid after 5 years.[143] Statutes of limitation should be properly circumscribed to avoid enforcement of unadministrable fines and to avoid creating an endless impediment to reentry.

*Scale Debts Based on Ability to Pay*

Legislatures should provide statutory authorization and incentives for jurisdictions to experiment with "day fines"—also known as structured fines[144]—which are widely used in Europe and Latin America and have been tested in several American jurisdictions.[145] Day fines are sanctions that are calibrated to an individual's ability to pay. Legislatures and courts determine how many "units" of punishment are merited for a specific offense and then those units are set against a person's income to determine an appropriate fine. One common unit would be one day's worth of wages, or a "day fine."[146] Experiments with day fines in the United States have been conducted at the municipal, county, and statewide level, both with and without statutory authority.[147]

## BURDENS TO SIXTH AMENDMENT RIGHTS

Defendants in nearly every state and the District of Columbia are statutorily required to pay costs associated with the exercise of their rights under the Sixth Amendment,[148] including the right to a defense attorney,[149] to a trial by jury[150] (including juror per diem charges[151]or general jury fees[152]), or to call witnesses for their defense.[153] They may also be charged witness fees, including the costs of subpoenas;[154] fees for essential investigation or evidence, including fees to process DNA or drug samples;[155] fees covering the costs of the prosecutor or law enforcement agents to prosecute the case;[156] and fees covering the costs of the court to hear and try the case, including stenographer fees or court personnel salaries.[157] These "Sixth Amendment Taxes" may burden a defendant's ability to exercise her constitutional rights and undermine the legitimacy and fairness of the criminal justice system.

By adding an economic cost to the exercise of constitutional rights, Sixth Amendment Taxes may operate as poverty penalties. Such costs may deter impoverished defendants from fully utilizing constitutional rights afforded to them in criminal cases. Ultimately, chilling the exercise of constitutional rights by poor defendants increases the chances that they will face worse criminal justice outcomes as a result of their poverty. There does not appear to be any systematic empirical evidence demonstrating the extent to which Sixth Amendment Taxes affect case outcomes for people who are too poor to afford these costs. There is, however, significant anecdotal evidence that these fees have real effects on decision-making by defendants. In a study of indigent counsel fees, NPR found that "poor people sometimes skip using an attorney," even though that attorney might be better equipped to help the defendant avoid high penalties resulting in even greater financial debt.[158] And a judge in Michigan estimated that 95% of defendants in his county waive their right to counsel after being informed that they might be required to pay for court-appointed

counsel and approximately half of defendants plead guilty at arraignment.[159] The increased economic costs attached to more severe sentences, including higher statutory fees[160] and higher incarceration rates,[161] may compound the already significant leverage that prosecutors enjoy in obtaining guilty pleas. The following reforms will help ensure that defendants are able to exercise their Sixth Amendment rights, regardless of their ability to pay:

- Legislatures must fully fund the criminal justice system through means other than Sixth Amendment Taxes. Simply removing Sixth Amendment Taxes without replacing the funding streams for courts and public defender officers will only result in more constitutionally deficient conditions for defendants.
- State judiciaries should enact court rules directing trial courts to conduct ability-to-pay determinations before Sixth Amendment Taxes begin to accrue; those rules should also direct trial courts to waive non-mandatory Sixth Amendment Taxes that would impose a significant financial hardship.
- Plea bargaining should not short-circuit ability-to-pay procedures. It is estimated that 90 to 95 percent of state and federal criminal cases are adjudicated through plea bargaining.[162] In exchange for more lenient sentences or diversion, some prosecutors may require defendants to agree to pay restitution or fines, even if the prospect of full payment is unrealistic.[163] Courts have reached different conclusions about whether a negotiated agreement to pay restitution as part of a plea bargain can substitute for an ability to pay determination.[164] But as a matter of policy, the ability to plead guilty or participate in a diversion program should not be predicated on the waiver of the right to an ability-to-pay hearing.[165]

*Authorize Alternatives to Monetary Sanctions*

Courts should be authorized to consider alternatives to monetary sanctions, including creating community or specialty courts, converting criminal justice debts to community service, or imposing other non-monetary penalties. Some jurisdictions have created community courts, where judges use trauma-informed and evidence-based approaches to ensure that defendants receive services in addition to appropriate sanctions, while increasing procedural justice.[166] Many, but not all, states currently authorize judges to impose community service as an alternative to incarceration, but the process could be further incentivized and streamlined.

The imposition of excessive or unreasonable community service may, of course, become a significant or insurmountable obstacle for indigent persons, especially those whose work schedules, family obligations, or disabilities make community service unrealistic. In

some cases, it may not be feasible for defendants to complete community service. In these situations, judges must have discretion to waive fines and fees, give defendants credit for engaging in drug or mental health treatment, or find an alternative sanction that does not involve jail.[167] Courts must guard against replacing one vise with another.[168] But in many instances, a well-designed community service program would present a viable and productive alternative.

## CONSIDERATIONS REGARDING COMMUNITY SERVICE

Substituting community service for monetary obligations is not a panacea. There are risks that might make community service unduly punitive. The following are important considerations for lawmakers, agencies, judges, placement sites and others who are interested in instituting community service programs:

- Work should be rehabilitative rather than punitive. Sentencing indigent debtors to clean government bathrooms or pick up trash from the highway may evoke chain gangs and stigmatize indigent defendants. Effective programs serve the needs of communities without demeaning people for being too poor to afford a monetary sanction.
- Community service should not unduly interfere with other obligations. For people with work, school, and family obligations, community service obligations should be carefully calibrated to avoid putting people in situations where they must choose between complying with court obligations and meeting basic needs.
- Community service hours should be valued at minimum wage or higher. Community service obligations will often assign a monetary value to each hour of service, so that the overall community service obligation will be satisfied when the individual accumulates a number of hours equivalent to the court-ordered financial obligation. It is important that the dollar value assigned to each hour of community service should be set at minimum wage or higher. This ensures that community service obligations remain reasonable and it reduces the risk that court-mandated community service will displace paid employees who might otherwise perform the assigned duties.[169]
- Courts and host organizations should address liability concerns, including worker's compensation claims.[170] Organizations that host those completing court-ordered community service may be liable both for any injuries that occur during the community service, as well as torts caused by the person performing community service. Non-profit organizations should consult with legal counsel and ensure they have adequate insurance before becoming host sites for court-ordered community service.
- Community service programs should consider safety. Some defendants, such as victims of violence or people who are involved with gangs, may not be able to engage in community

service programs in particular locations or in the public view. Courts and probation departments should consider a defendant's safety when tailoring a community service program to a particular person.

- Defendants should not be required to pay fees or purchase insurance to participate in community service.[171]
- Transportation should be provided, especially for those with suspended licenses due to criminal justice debt.[172]

Before implementing community service programs, states should also create statewide or jurisdiction-specific standards, governed by applicable law. In New York State, for example, the Division of Criminal Justice Services drafted *Community Service Standards*,[173] which outlines relevant law, such as New York labor and human rights law, as well as administrative considerations. Some characteristics of well-designed community service programs include elements of restorative justice, some degree of choice and agency for defendants, and meaningful integration of volunteers with court-ordered defendants in the service of real work.[174] As an overarching consideration, community service should aim to set up individuals for success, not failure, which means that community service obligations should be realistically discharged within a reasonable amount of time. Crafting community service obligations with a rehabilitative purpose can also help to offset some of the administrative costs by avoiding the costs of future criminal conduct. With proper implementation, the benefits of such programs may include reduced rates of recidivism, the completion of important civic projects, and community building.[175]

### *De-link Debt and Reentry*

Legislatures should reduce the collateral consequences that indigent defendants face as a result of criminal justice debt when they leave prison. Parole supervision fees[176] and requirements that prisoners repay the costs incurred from their incarceration[177] are unlikely to provide states with substantial revenue but may undermine efforts to minimize recidivism. The following policies de-link debt from reentry:

- De-link Payment from Expungement. Expungement of a criminal record should not be conditioned on a person's financial status. In some states the full payment of court debt is a requirement for expungement;[178] in others, mandatory expungement fees may act as a barrier to reentry.[179] Both of these practices constitute poverty traps. Conditioning expungement on payment of criminal justice debt should only occur, if ever, when a robust ability to pay determination demonstrates that non-payment is willful. Expungement has hugely significant consequences for, among other things, employment and housing opportunities; it is unfair and counterproductive to link

those outcomes to wealth. Indeed, for many individuals released from prison, conditioning expungement on repayment will create a vicious cycle: those individuals may have accumulated extremely high court debt, yet they will have earned no significant income during their period of incarceration and their ability to obtain employment upon release may be significantly impeded by court records.

- De-link Payment from Voting Rights. States should eliminate the payment of criminal justice debt as a requirement to restore voting rights. One recent report found that 30 states have laws that disenfranchise people who owe criminal justice debt.[180] Voting is simply too fundamental a right to condition on whether a person has made a monetary payment, and the consequences are especially stark for people who cannot afford to pay criminal justice debt and therefore face a potential lifetime of disenfranchisement.[181]

*Create Amnesty Programs*

In some cases, a defendant may be able to pay part of a debt but fears coming forward to do so. State legislatures should authorize programs designed to incentivize debtors to come out of the shadows and make what payments they can by enrolling in feasible payment plans and payment forgiveness programs. These "amnesty programs" have been implemented to collect revenue that would have otherwise likely gone unclaimed while also allowing people to clear warrants and reestablish licenses.[182]

### SPECIAL CONSIDERATIONS FOR JUVENILES

Juveniles and their families who may be burdened with fines, fees, and restitution as a result of juvenile justice system involvement face unique harms due to criminal justice debt.[183] The imposition of this debt may be widespread—one study in Pennsylvania found that 80% of juvenile defendants were burdened with criminal justice debt.[184]

For young people and their families, the imposition and collection of criminal justice debt may undermine the rehabilitative goals of the juvenile justice system—pushing young people deeper into the criminal justice system and negatively impacting their family relationships. When juveniles are responsible for paying this debt, they may have terms of probation extended and can become enmeshed in the criminal justice system as adults based on their failure or inability to pay criminal justice debt.[185] Many young people have no way of accessing money to pay for criminal justice debt because of limits on their ability to work, or because working excessive hours could negatively impact their education.[186] Additionally, expungement and record sealing may not be available to young people until fines and fees are paid, or probation terms are over.[187] Finally, civil judgments can negatively impact a young person's credit, limiting their ability to access jobs, housing, and educational loans.[188]

In light of these concerns, some jurisdictions across the country have reduced or eliminated criminal justice debt for juveniles. Alameda County, California recently repealed administrative fees that are charged to the families of juveniles in the criminal justice system.[189] California is considering statewide legislation that would prevent counties from charging these fees altogether.[190] Washington State passed the Year Act, which eliminated some juvenile justice system fees and fines, and allowed young people to have their records sealed if they had made good faith efforts towards paying off restitution.[191]

For a comprehensive discussion of the ways in which criminal justice debt impacts juveniles and their families, see Jessica Feierman et al., Juvenile Law Center, *Debtors' Prison for Kids?: The High Cost of Fines and Fees in the Juvenile Justice System* (2016).

## Judicial Reforms

### *Amend Court Rules*

State supreme courts should enact court rules to encourage the use of alternative conditions—such as payment plans, conversion to community service, and fine waivers—when payment of an amount owed would pose a significant hardship, as discussed above. Recently, the Supreme Court of Michigan enacted new court rules that guide Michigan courts in the exercise of this discretion, including rules allowing for a court

to modify a debt: "If the court finds that the defendant is unable to comply with an order to pay money without manifest hardship, the court may impose a payment alternative, such as a payment plan, modification of any existing payment plan, or waiver of part or all of the amount of money owed."[192] Courts around the country may seize the initiative to eliminate poverty traps and penalties. The space available for court-led change will often depend on the underlying legal requirements. Where not precluded by statutes affirmatively mandating practices that constitute poverty traps or penalties, many of the legislative reforms outlined above—including those that involve waiving or capping unnecessary fees or de-linking access to important resources from payment of court debt—could be accomplished through court rules that constrain discretion by individual judges.

*Create Diversion Courts*

Another potentially useful intervention is the establishment of diversion courts where judges may waive certain fines and fees for participation in activities like educational or drug treatment programs.[193] One example is Houston's Homeless Court, where homeless defendants can resolve outstanding misdemeanor warrants. The program is voluntary, it does not require defendants to give up any due process protections if they later choose to go to trial, and defendants play an active role in working with local agencies to propose how they can fulfill their sentence's requirements by participating in community service, counseling, computer or literacy classes, or job-search programs.[194] Where governed by appropriate safeguards and limited in scope, these alternative courts can ensure appropriate criminal justice interventions that do not punish or perpetuate poverty. Finally, when creating diversion courts, chief justices or chief judges should ensure adequate training—including training on implicit bias to ensure that individuals are not disproportionately excluded from diversion courts based on their race.

## Executive Reforms

*Exercise Authority Over Collection Agencies*

In many states, the attorney general is responsible for collecting debts owed to the state, either by collecting debts directly or by contracting with third-parties to collect debts.[195] Sometimes the line between action taken by a state attorney general's office and a private debt collection company or private contractor is blurry. For example, in Ohio, private debt collectors used letterhead from the attorney general's office when they sent demand letters arising from debt owed to the state.[196] When attorneys general contract with third parties to collect criminal justice debt, they should structure contracts to require debt-collectors to use reasonable payment plans (as discussed above) and prohibit the use of abusive or unfair debt collection practices and excessive fees.

*Monitor Civil Rights Consequences*

In many instances, the practices that constitute poverty penalties or traps may not be applied equally. When imposed in a racially disparate manner, practices like license suspension or extended terms of court supervision may deepen existing racial disparities in access to opportunity.[197] In most states, the attorney general's office will have a civil rights division with broad authority to monitor, and shine a spotlight on, practices resulting in unwarranted racial disparities.[198] Attorneys general should exercise that authority to identify and help eliminate discriminatory practices by local actors, whether they grow out of overt or implicit bias.

## 4. ABILITY-TO-PAY DETERMINATION

Judges across the country routinely incarcerate people for failure to pay criminal justice debt without regard to the financial circumstances that may make payment impossible.[199] This practice violates well-established constitutional principles. Moreover, incarcerating individuals because of their inability to pay imposes a particular hardship on some of the most vulnerable members of society,[200] and exacerbates racial and socioeconomic inequalities in the criminal justice system.[201] Additionally, the practice leads to wasted resources, as efforts to secure payment from individuals who may be unemployed, homeless, or simply too poor to pay are often fruitless.[202] Accordingly, a crucial reform is to ensure that no one is ever jailed because they cannot afford to pay a fine or fee.

The Supreme Court has made clear that the Constitution prohibits courts from jailing people for not paying debt that they are too poor to afford. In *Bearden v. Georgia*, a case involving the automatic revocation of probation where a probationer did not make required payments, the Court held that "depriv[ing] a probationer of his conditional freedom simply because, through no fault of his own he cannot pay a fine...would be contrary to the fundamental fairness required by the Fourteenth Amendment."[203] Similarly, in *Tate v. Short*, the Court held that the Equal Protection Clause of the Fourteenth Amendment "prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full."[204] The Court emphasized that a *willful* failure to pay a fine was distinguishable from a defendant's inability to do so.[205] It is because of this distinction—between a defendant who refuses to pay criminal justice debt and a defendant who lacks the means to pay—that an ability to pay determination must take place before someone is jailed for nonpayment of criminal justice debt.

The Supreme Court has recently provided guidance on what an ability-to-pay determination should consist of. In *Turner v. Rogers*, the Court held that finding a man in contempt of court and jailing him for unpaid child support payments without inquiring into his financial status "violated the Due Process Clause."[206] In reaching its holding, the Court also noted certain procedures which, taken together, create "safeguards" that can "significantly reduce the risk of an erroneous deprivation of liberty" in the nonpayment context.[207] These safeguards include:

> *(1) notice to the defendant that his "ability to pay" is a critical issue in the contempt proceeding; (2) the use of a form (or the equivalent) to elicit relevant financial information; (3) an opportunity at the hearing for the defendant to respond to statements and questions about his financial status, (e.g., those triggered by his responses on the form); and (4) an express finding by the court that the defendant has the ability to pay.*[208]

The Court left open the possibility that even more stringent protections, including the right to counsel, may be appropriate where the government is affirmatively seeking to have an individual jailed based on non-payment of criminal fines or fees.[209]

This section outlines reforms designed to put in place robust ability-to-pay procedures.

## Legislative Reforms

### *Codify Critical Elements of Ability-to-Pay Proceedings in State Law*

Ability-to-pay determinations have several critical elements which should be mandated by statute for situations where courts need to determine a defendant's ability to pay criminal justice debt:

- Robust notice provisions. Defendants should receive comprehensive notice outlining the financial obligations they face, the standards that will be applied, the information that will be considered, and their right to counsel. It is especially important for defendants to have notice about what types of documents they should bring to the hearing (e.g., tax returns, pay stubs, bank account information, proof of receipt of public benefits).
- Clearly articulated and well-defined operative terms. Statutes should define operative terms such as "indigent," "ability to pay," and "financial hardship."[210] It is also imperative that statutes clearly define what follows from the application of these terms. For example, a jurisdiction may impose a standard of "indigency" that, where applicable, triggers a requirement or a presumption that all financial obligations be waived or modified. On the other hand, certain standards (e.g., "undue hardship") may require courts to scale or adjust monetary obligations—either by reducing their absolute magnitude or requiring reasonable payment plans—to make them consistent with an individual's financial circumstances.

- Clear burden of proof. Ability-to-pay determination procedures should make clear both the burden that must be met and which party must meet it.
- Presumptions of inability to pay based on indigency. To make determinations more efficient, statutes may include rebuttable presumptions that people who are indigent, either because their income is below a certain threshold or because they receive public benefits, are unable to pay criminal justice debt.[211]
- Clear description of the sources of financial information considered. A court may consider, for example, tax forms, public benefit eligibility, affidavits, or other documents that can give a realistic picture of a person's financial status. The standards for demonstrating inability to pay criminal justice debt should not be overly onerous or unnecessarily stringent. Excessively burdensome documentation requirements run the risk that courts will reach erroneous determinations of a defendant's ability to pay due to the defendant's inability to produce required documents. It is also important that courts consider, among other things, the full array of legal fees and fines a defendant faces. While a relatively low-level fine in one jurisdiction may not prove catastrophic on its own, an impoverished defendant may face truly severe burdens when shouldering the cumulative weight of financial obligations imposed in numerous proceedings or by multiple jurisdictions.[212]
- Ability-to-pay findings on the record. Requiring courts to make express findings of ability to pay on the record serves the functions of ensuring that requisite procedures are followed, effectively informing the defendant of the outcome of a determination, and aiding in any subsequent review.[213]

A final crucial consideration is when ability-to-pay determinations should occur. The elements of an ability-to-pay proceeding listed above should be considered critical ingredients of such proceedings whenever they take place. As discussed above, well-established constitutional principles require ability-to-pay determinations prior to incarcerating a person for non-payment. Though not mandated by established Supreme Court case law, policy considerations counsel in favor of conducting such determinations when financial obligations are imposed, not simply when a court is deciding whether to incarcerate someone for non-payment. Although there are costs associated with conducting ability-to-pay determinations when financial obligations are imposed, assessing a defendant's ability to pay at that earlier stage may ultimately be far more efficient than waiting until a defendant has defaulted. Efforts to collect criminal justice debt that a defendant cannot pay are costly, so the net financial impact on a jurisdiction should reflect the benefit of avoiding measures to recoup uncollectable debt.[214] Beyond the increased efficiencies that flow from avoiding futile collection efforts, assessing

**The Supreme Court has made clear that the Constitution prohibits courts from jailing people for not paying debt that they are too poor to afford.**

financial circumstances at the imposition stage will avoid unnecessarily enmeshing impoverished defendants in the criminal justice system through arrests or court proceedings connected to enforcement of unpaid debt.[215] When financial circumstances are assessed at the imposition stage, defendants should generally also have an opportunity to raise changes in their financial circumstance that render them unable to pay whatever financial obligations were imposed.[216]

**CASE STUDY**
**BILOXI SETTLEMENT**

A settlement agreement in a federal lawsuit challenging practices in the municipal court of Biloxi, Mississippi provides a potential model for defining the mechanics of ability-to-pay determinations.[217]

- Timing of ability-to-pay determination. Under the agreement, the court shall conduct an ability-to-pay determination when "determining the amount of LFOs, establishing an LFO Payment Plan, or addressing the nonpayment of LFOs in a hearing."[218]
- Considerations in determining ability to pay. In determining ability to pay, a court must consider "the defendant's efforts to earn money, secure employment, and borrow money, as well as any limitations on the defendant's ability to engage in such efforts due to homelessness, health and mental health issues, temporary and permanent disabilities, limited access to public transportation, limitations on driving privileges, and other relevant factors."[219]
- Standard form. Defendants complete an "LFO Inability to Pay Form" to document their income and assets, any outstanding debts, and their efforts to borrow money as well as any attempts to find work.[220]
- Alternatives to incarceration. If a judge determines that the defendant is unable to pay, the judge must consider alternatives to incarceration, including waiver or reduction in fines, community service, completion of job training or other educational programming, or an extension of time to pay.[221]

*Amend or Repeal Facially Unconstitutional Statutes*

Many states maintain laws that, on their face, contradict the constitutional protection against being jailed based on inability to pay a financial obligation. For example, some states have statutes permitting incarceration of individuals whose failure to pay is based on inability to afford financial obligations[222] or mandating automatic incarceration for failure to pay criminal justice debt without providing an ability-to-pay

determination.[223] Such statutes should be repealed or amended to conform to minimal constitutional requirements.

*Eliminate Presumptions of Ability to Pay Criminal Justice Debt*

Presumptions that all defendants are able to pay criminal justice debt are bad public policy. Examples of these practices include not only blanket presumptions that all defendants are able to pay criminal justice debt,[224] but also presumptions of an ability to pay based on circumstances that are not necessarily tethered to a defendant's financial situation (such as paying a bail bond)[225] and consideration of a defendant's imputed future income. [226] An inaccurate ability-to-pay determination or no ability-to-pay determination, coupled with the threat of imprisonment for failure to pay criminal justice debt, can cause defendants to take desperate measures, including handing over money from the disability and welfare checks that they need to survive.[227] Statutes governing criminal justice debt should not impose presumptions that may cause individuals to be erroneously deemed to have engaged in willful non-payment when in fact they lack the ability to pay.

## Judicial Reforms

State supreme courts should also enact court rules or administrative orders to ensure robust ability-to-pay proceedings. The same critical elements of ability-to-pay determinations outlined above should guide those rules or orders.

*Provide Judicial Education*

Chief justices or a state's administrative office of the court can educate trial court judges to ensure compliance with constitutional principles. This can be done in a variety of ways, including:

- Judicial training. Judges who are tasked with imposing fines and fees or adjudicating a defendant's default on criminal justice debt should be trained on the holdings of *Bearden* and *Turner* and relevant procedures, obligations, standards, and considerations.[228] When new judges take the bench, they should undergo training prior to presiding over any matters that involve the imposition or collection of criminal justice debt.[229]
- Bench cards. Circulating a user-friendly and information-rich document to judges can help ensure that defendants who come before them are not erroneously deprived of their liberty on the basis of their inability to pay criminal justice debt. Bench cards relating to criminal justice debt issues are currently in use in multiple states.[230]
- Guidance regarding warrants for nonpayment. The statewide administrative office of the courts should analyze failure-to-pay arrests and issue guidance providing that no warrants will issue for the nonpayment of criminal justice debt.[231] For example, an

analysis was undertaken in Denver and resulted in the cancellation of 12,500 active warrants and a projected revenue gain based on reduced costs for serving warrants and incarcerating people for nonpayment.[232]

*Create Standard Forms*

Creating standard forms for ability-to-pay determinations and court orders can help eliminate inconsistent ability-to-pay determinations. For example, the recent Montgomery settlement requires that an "Affidavit of Substantial Hardship Form" be used to elicit relevant and consistent financial information from defendants in the nonpayment context.[233] Such forms reduce the risk that an important component of a defendant's financial situation will be overlooked.

*Conduct Periodic Audits*

Reviewing court collections practices through periodic audits can aid in monitoring individual judges' adherence to *Bearden*'s mandate. For example, the Michigan State Court Administrative Office outlines model collections practices and requires audits to verify that courts are in compliance.[234]

*Take Enforcement Actions*

Judges should be disciplined if they fail to follow *Bearden*'s mandate. The Ohio State Bar Association did just that in the case of a judge who failed to follow required procedures to determine a defendant's ability to pay criminal justice debt prior to ordering incarceration for nonpayment.[235]

## Executive Reforms

There are a number of executive branch actions that can be undertaken to prevent the incarceration of individuals on the basis of their inability to pay criminal justice debt. These include:

*Disseminate Information to the Public*

The state attorney general should publish know-your-rights information via the Internet and other accessible media outlets to inform indigent defendants of their basic constitutional and statutory protections with respect to any inability to pay criminal justice debt, their right to counsel, and other procedural protections.

*Issue Clarifying Legal Opinions*

The state attorney general should issue legal opinions explaining the scope of constitutional protections, minimal requirements for ability-to-pay determinations, instances in which criminal justice debt can and should be waived, and the consequences under state anti-discrimination law of systematic racial disparities in rates of jailing for

non-payment.[236] The ability to request a state attorney general's opinion is dictated by state law and is restricted to certain entities.[237] South Carolina is one state that broadly authorizes officials, including to the Deputy Director and General Counsel of the South Carolina Commission on Indigent Defense, to request attorney general opinions.[238] In other states, public defenders could be best suited to request state attorney general guidance about criminal justice debt issues where private citizens do not have standing to do so.

*Conduct Audits and Monitor Compliance*

To the extent that police practices and the imposition or collection of criminal justice debt violate state or federal civil rights law, state attorneys general may have the ability to investigate these practices through their office's civil rights division.[239]

## 5. TRANSPARENCY AND ACCOUNTABILITY

Ensuring meaningful transparency in the operation of criminal justice debt is crucial. Prioritizing transparency enables reform in many ways. Access to information about the mechanics of criminal justice debt—including rich quantitative data—equips advocates to identify abusive practices, racial disparities, and inefficiencies. It provides lawmakers with the tools to evaluate the financial and social impacts of criminal justice debt when proposing or voting on legislation. And it provides citizens with the information required to hold their elected officials accountable.

The transparency frameworks of many states, however, impede these goals. Empirical data on the imposition and collection of criminal justice debt is often not collected or made publicly available. Even when it is, the data is often compiled by an array of agencies and bodies—clerks of courts, probation agencies, corrections officials, and private debt collection companies—which makes the information piecemeal and inaccessible. The statutory provisions imposing and regulating criminal justice debt often sprawl across many titles of a state's code, including those related to crimes, criminal procedure, courts, local government, vehicles, corrections, and revenue. The result is often an incomprehensible mess of provisions, as difficult to decipher as a tax code.[240] This opacity increases administrative costs[241] and obscures the responsibility of legislators.

There is also a fundamental fairness principle underpinning the following reforms. A defendant is entitled to know, prospectively, of the financial obligations for which he or she may become liable. Once convicted, a person has a right to know what financial obligations were imposed and the legal basis for that imposition. The absence of this information, in a clear and accessible form, compromises a defendant's ability to challenge the imposition and collection of criminal justice debt. Confusion as to what debts

remain outstanding against a person can lead to non-compliance with payment plans, even when a person has the capacity to pay their debts. In the worst-case scenario, it can lead to a summons or warrant being issued against a person for failure to pay, and needless incarceration.

The following sections propose procedures to enhance transparency and promote accountability.

## Legislative Reforms

### *Collect and Publish Data on Criminal Justice Debt*

States should collect data that would illuminate the practices surrounding criminal justice debt. Although court systems can and should do this without statutory authorization, legislation requiring and providing funding for data collection would ensure that courts engage in data collection in a uniform manner. Ideally, the data would be collected and compiled by a centralized body and published in a unified report. Such data should include:

- Imposition of debts: How much criminal justice debt is being imposed by each court, correctional facility, debt-collection company, or other entity? On which statutory bases? Are there race disparities in the imposition of criminal justice debt?
- Revenue collection: How much criminal justice debt is being collected (fines, fees, costs, assessments, etc.)? What methods are being used to collect the debt (e.g. incarceration, suspension of licenses, payment plans)?
- Disposition of collected money: How much criminal justice debt is being paid into state or municipal general revenue funds, specific earmarked funds, or directly to other entities?
- Collection costs: What is the cost of collecting criminal justice debt, by courts, probation agencies, correctional facilities, or private debt collection companies?[242]
- Waivers based on inability to pay: How frequently are waivers based on an inability to pay being granted? Are there race disparities in the granting of waivers? How frequently are payment plans or payment alternatives being used?[243]
- Probation: How often is probation revoked for a failure to pay debts? How often is probation being extended for a failure to pay debt?
- Bases for arrests and incarceration: How many warrants are issued and executed on the basis of a failure to pay or failure to appear at a proceeding related to criminal justice debt? How often are individuals found in contempt for failure to pay or failure to appear at proceedings relating to criminal justice debt? Of these, how many people are incarcerated?

Some states already have legislation imposing reporting obligations. For example, Michigan requires the clerk of each court to report on the total number of cases in which costs or assessments were imposed, the total amount of costs or assessment that were imposed by the court, and the total amount of costs or assessments that were collected by the court.[244] South Dakota, which passed legislation in 2015 establishing an Obligation Recovery Center to consolidate the collection of money owed to state agencies and programs, requires the center to annually report the number of debts referred to it, the annual amount and nature of the debt obligations recovered by the center, the number of debts referred from the center to private collection agencies and the results of those referrals, and the costs and expenditures incurred by the center.[245]

*Establish a Commission to Review Existing and Proposed Fines and Fees*

A commission tasked with studying proposed fines and fees to assess their financial and social impacts will encourage a more fair and rational criminal justice system. For example, the Illinois Access to Justice Act created a Statutory Court Fee Task Force, made up of representatives from all three branches of government. After spending a year reviewing the fines and fees that are imposed in civil and criminal cases, the Task Force released a report with its findings and recommendations.[246] Periodic review of existing fines and fees, at least every three to five years, would allow states to evaluate the impact of any new or revised fees and fines, as well as to assess the cumulative impact of all fees and fines.[247] A commission made up of a broad range of stakeholders could generate balanced and bipartisan recommendations.

## CASE STUDY

### THE MASSACHUSETTS SPECIAL COMMISSION TO STUDY THE FEASIBILITY OF ESTABLISHING INMATE FEES

The Massachusetts Special Commission to Study the Feasibility of Establishing Inmate Fees provides an example of a successful model for evaluating the imposition of fees and fines. The commission was tasked with conducting a comprehensive study of the feasibility of establishing inmate fees within the correctional system, including the types and amount of fees to be charged, the revenue that could be generated from the fees, the administrative costs, and the impact on the affected population.[248] The enabling statute provided that the membership of the commission should include sheriffs, representatives from prisoners' legal services, public defenders, and correctional system union representatives.[249] The commission conducted surveys, literature reviews, and phone interviews. The commission concluded that establishing additional inmate fees would lead to "a host of negative and unintended consequences," including acting as a barrier to successful re-entry.[250]

*Include Fiscal Impact Statements in New Legislation*

A fiscal impact statement provides a projection of the costs and benefits of proposed legislation. A fiscal impact statement may encourage legislators to enact rational, cost-saving reforms and help depoliticize the policymaking process.[251] A number of states have enacted laws requiring fiscal notes for at least some criminal justice bills, often those increasing sentences or creating new crimes.[252] A joint report by the Center on Budget and Policy Priorities and the ACLU is a useful resource for advocates, laying out best practices for creating consistent, properly researched, detailed, and accessible fiscal notes.[253]

**The statutes imposing criminal justice debt often sprawl across many titles of a state's code. The result can be an incomprehensible mess of provisions, as difficult to decipher as a tax code. This opacity increases administrative costs and obscures the responsibility of legislators.**

*Expand Public Records Laws to Include Revenue and Collection of Court Debt*

In some states, the judiciary is exempt from open records law.[254] While records may nonetheless be accessible through other channels, accessing information may be unnecessarily complicated. Data on court revenue and expenditures, and on the imposition and collection of court debt, should be covered by statutory open records regimes. Further, where an open records law does extend to the judiciary, courts must establish proper procedures to ensure compliance with their legal obligations.[255]

*Require that Criminal Justice Debt Statements Be Issued to Defendants*

A defendant should be entitled to a statement that itemizes all amounts that he or she owes towards fees, fines, restitution and other assessments, the legal basis for each amount, and the date by which it is due. These statements should be tested for readability and should avoid jargon. Statements should also include clear instructions on what to do if a person is unable to pay the debt. Generally, it will be appropriate for a judge to issue such a statement during sentencing,[256] and requiring that such statements be read aloud in open court is a best practice to ensure defendants understand the obligations they face and that the imposition of fees and fines occur in a transparent manner. However, where other bodies, such as a department of corrections or a probation agency, are empowered to impose debt obligations on a defendant, they should also be bound to provide a statement of what the defendant owes.[257] In Texas, a recent law prevents courts from imposing costs on defendants unless a written bill listing the costs is provided to the defendant and signed by the official who is imposing the cost or receiving the revenue.[258]

### *Collect and Publish Data on Private Probation or Debt-Collection Companies*

Many states authorize localities to outsource probation supervision[259] or debt collection.[260] These companies, and the government actors who engage them, should be accountable to the public for their policies and performance. Accordingly, contracts with private probation or debt-collection companies should be required to be disclosed and easily accessible (typically via an online portal). Private contractors should also have to maintain and disclose records relating to their impact on the criminal justice system, such as the number of defendants they are assigned to, the total amount of criminal justice debt collected, the amount of collection fees or supervision fees collected from individuals, the rate at which individuals whose accounts they pursue are jailed, and the recidivism rates of individuals subject to private supervision or collection.

## CASE STUDY
### REGULATION OF PRIVATE PROBATION IN GEORGIA

In 2015, after ongoing criticism of its private probation industry, Georgia passed House Bill 310 to strengthen oversight of private probation companies.[261] All private companies which enter into a contract to provide probation services need to provide quarterly reports summarizing:

- The number of offenders under supervision;
- The amount of fines, statutory surcharges and restitution collected;
- The amount of fees collected and the nature of such fees (including probation supervision fees, rehabilitation programming fees, etc.);
- The number of community service hours performed by probationers under supervision;
- Any other service for which a probationer was required to pay;
- The number of offenders for whom supervision or rehabilitation has been terminated and the reason for the termination; and
- The number of warrants issued during the quarter.[262]

The reports are subject to public inspection, and local governments are encouraged to post electronic copies on their website.[263]

## Judicial Reforms

*Issue Rules Requiring that Warrants Indicate the Reason for their Issuance*

The procedures for issuing warrants for arrest are ordinarily regulated by court rules. In many states, warrants do not state the reason for their issuance. This impedes the collection of data on incarceration for failure to pay criminal justice debt.

Circumstances in which incarceration relating to criminal justice debt may be masked include:

- When payment of criminal justice debt is a condition of probation or parole, the basis for a warrant arising out of a failure to pay may only be recorded as a violation of probation or parole without explanation of the underlying reason;
- When a person misses a court hearing at which she would be required to pay a debt she cannot afford, and is subsequently arrested as a result, the arrest may be simply recorded as a failure-to-appear without noting that the appearance was entirely for purposes of enforcing court debt.[264]

Court rules should require that warrants clearly indicate the underlying reason for their issuance.

*Make Information Accessible Online*

Many courts have begun to use their website as a public information tool by uploading schedules of fines and fees.[265] Websites can also include a "Frequently Asked Questions" page that explains how to pay fines or fees, how court procedures work, what somebody should do if they can't pay their debt, and the rights of a criminal defendant against whom criminal justice debt has been or may be imposed.[266]

*Use Judicial Directives to Clarify Which Fees Are Discretionary*

Many provisions imposing criminal justice debt across the states do not indicate whether a judge has discretion to waive or suspend the fine or fee. Similarly, many provisions are silent as to whether an ability to pay determination is required prior to its imposition, or at least whether a defendant can challenge the imposition of a fine on the basis of an inability to pay.

Courts may clarify these statutory ambiguities through judicial directives. For example, in Colorado, a judicial directive was issued stating:

> *If the statute or rule is silent as to the court's authority for waiver or suspension of the specific fine, fee, surcharge, or cost being considered, this [judicial directive] shall provide authority for the court to waive or suspend the imposition or collection of the amount only in those instances where the court finds the Defendant or Respondent has no ability to pay the assessed amount.*[267]

### Executive Reforms

#### *Audit Courts*

Auditing agencies (e.g., comptrollers) should conduct regular audits regarding revenue generated by courts, screening for efficiency, fairness, and perverse incentives. Executive agencies with auditing or accounting expertise should be used to analyze the criminal justice debt system. This is already occurring in some states—the Virginia Auditor of Public Accounts, for example, has conducted special reviews of the courts' collection system of unpaid fines and fees.[268]

## 6. MOVING AHEAD

Advocates and policymakers seeking to reform criminal justice debt face pronounced challenges. The laws and informal practices that have led to widespread abuse are entrenched and complex, guiding the actions of numerous actors and embedding harmful incentives throughout the system. Yet the opportunities for reform are also significant, and should be seized. There is growing awareness that over-reliance on criminal justice debt distorts critical aspects of the legal system. It causes grave individual injustice and erodes the legal system's legitimacy. No single reform outlined in this guide is a silver bullet, and different states will present different needs and opportunities. The aim of this guide is to equip advocates and policymakers to identify promising levers of reform and move forward with concrete, workable solutions.

# ENDNOTES

1. *See* Alexes Harris et al., *Drawing Blood from Stones: Legal Debt and Social Inequality in the Contemporary United States,* 155 Am. J. of Sociology 1753, 1777 (2010).
2. *See* Carl Reynolds & Jeff Hall, Conference of Adm'rs, *Courts are Not Revenue Centers* 1 (2012), *available* at https://csgjusticecenter.org/wp-content/uploads/2013/07/2011-12-COSCA-report.pdf.
3. *See* Dep't of Justice, Office of Justice Programs Diagnostic Ctr., *Resource Guide: Reforming the Assessment and Enforcement of Fines and Fees* 3 (2015).
4. *See, e.g.,* Am. Civil Liberties Union, *Written Statement Before the U.S. Commission on Civil Rights, Hearing on Municipal Policing and Courts: A Search for Justice or a Quest for Revenue* 2 (Mar. 18, 2016), *available at* https://www.aclu.org/sites/default/files/field_document/aclu_statement_usccr_03182016_municipal_courts_and_police_choudhury.pdf (describing how practices around criminal justice debt are "racially-skewed due to the dual impact of racial disparities in the criminal justice system and the racial wealth gap").
5. *See generally* Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (2010); David Cole, *No Equal Justice: Race and Class in the American Criminal Justice System* (1999).
6. *See, e.g.,* Pew Research Ctr., *Wealth Gaps Rise to Record Highs Between Whites, Blacks and Hispanics* (July 26, 2011), *available at* http://www.pewsocialtrends.org/2011/07/26/wealth-gaps-rise-to-record-highs-between-whites-blacks-hispanics/ (finding that the median wealth of white households is 20 times that of black households and 18 times that of Hispanic households).
7. U.S. Dep't of Justice, Civil Rights Div., *Investigation of the Ferguson Police Department* 2 (2015), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2015/03/04/ferguson_findings_3-4-15.pdf [hereinafter *Ferguson Report*].
8. *Id.* at 64-69. *See also* Consent Decree, *United States v. City of Ferguson,* 4:16-cv-000180-CDP (E.D. Mo. March 17, 2016), *available at* https://www.justice.gov/crt/file/833701/download [hereinafter Ferguson Consent Decree].
9. Ferguson Consent Decree, *supra* note 8, at 115.
10. Back on the Road California, *Stopped, Fined, Arrested: Racial Bias in Policing and Traffic Courts in California* 2 (April 2016), *available at* http://www.lccr.com/wp-content/uploads/Stopped_Fined_Arrested_BOTRCA.pdf.
11. *See generally* Am. Civil Liberties Union, *supra* note 4, at 2 (describing how criminal justice debt practices are "racially-skewed due to the dual impact of racial disparities in the criminal justice system and the racial wealth gap"); Dan Kopf, *The Fining of Black America,* Priceonomics, June 24, 2016 (examining nationwide census data and finding that "best indicator that a government will levy an excessive amount of fines is if its citizens are Black" ), *available at* http://priceonomics.com/the-fining-of-black-america.
12. *See, e.g.,* Alexes Harris, *A Pound of Flesh: Monetary Sanctions as Punishment for the Poor* 87 (2016) ("Court officials commonly claimed that [legal financial obligations] were a source of revenue—collection programs across the United States and in Washington State do recoup a relatively large amount of money—and most of them said that obtaining money was in fact a primary goal of assessing LFOs").
13. *See* Alicia Bannon et al., Brennan Ctr. for Justice, *Criminal Justice Debt: A Barrier to Reentry* 10 (2010), *available at* http://www.brennancenter.org/sites/default/files/legacy/Fees%20and%20Fines%20FINAL.pdf (finding that none of the states surveyed measured the human costs or fiscal costs of criminal justice debt collection efforts).
14. *See, e.g.,* Class Action Complaint, *Foster v. City of Alexander City,* No. 3:15-cv-647-WKW (N.D. Ala. Sept. 8, 2015), *available at* https://www.scribd.com/document/279532267/Alexander-City-Lawsuit [hereinafter Alexander City Complaint]; Class Action Complaint, *Kennedy v. City of Biloxi,*

No. 1:15-cv-00348-HSO-JCG (S.D. Miss. Oct. 21, 2015), *available at* https://www.aclu.org/sites/default/files/field_document/kennedy_v._city_of_biloxi_-_complaint.pdf [hereinafter Biloxi Complaint]; Class Action Complaint, *Bell v. City of Jackson*, No. 3:15-cv-732-TSL-RHW (S.D. Miss. Oct. 13, 2015), *available at* https://docs.google.com/viewerng/viewer?url=http://jacksonfreepress.media.clients.ellingtoncms.com/news/documents/2015/10/13/bell_v_jackson_complaint_100915.pdf [hereinafter City of Jackson Complaint].

15. *See, e.g.*, Mitali Nagrecha et al., Ctr. for Cmty. Alternatives, *When All Else Fails, Fining the Family: First Person Accounts of Criminal Justice Debt* (2015), *available at* http://www.communityalternatives.org/pdf/Criminal-Justice-Debt.pdf (describing the impact of criminal justice debt on people returning from prison and their families); Bannon et al., *supra* note 13 (examining how collection practices can lead to cycles of debt and debtors' prison); Am. Civil Liberties Union, *In for a Penny: The Rise of America's New Debtors' Prisons* (2010), *available at* https://www.aclu.org/files/assets/InForAPenny_web.pdf [hereinafter *In for a Penny*] (documenting the stories of people jailed based on their inability to pay criminal justice debt); Thomas Harvey et al., ArchCity Defenders, *Municipal Courts White Paper* (2014), *available at* http://03a5010.netsolhost.com/WordPress/wp-content/uploads/2014/08/ArchCity-Defenders-Municipal-Courts-Whitepaper.pdf (describing unconstitutional practices in some St. Louis area municipal courts that lead to debtors' prisons and the poorest residents subsidizing the costs of the municipal court system); deVuono-powell, et al., Ella Baker Ctr. for Human Rights, *Who Pays? The True Cost of Incarceration on Families* (2015), *available at* http://ellabakercenter.org/sites/default/files/downloads/who-pays.pdf (describing the impact of collateral consequences of incarceration on family members of incarcerated people); Allyson Fredricksen & Linnea Lassiter, *Disenfranchised by Debt: Millions Impoverished by Prison, Blocked from Voting* (March 2016), *available at* http://allianceforajustsociety.org/wp-content/uploads/2016/03/Disenfranchised-by-Debt-FINAL-3.8.pdf (showing how outstanding criminal justice debt prevents many formerly incarcerated people from voting); Back on the Road California, *supra* note 11 (examining racial and socio-economic disparities in drivers' license suspension for unpaid fines and fees in California).
16. *See, e.g.*, Harris, *supra* note 12; Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014). Other scholars have received funding to conduct empirical research on the effects of criminal justice debt. *See, e.g.,* Press Release, Laura and John Arnold Foundation Addresses Use of Fines and Fees in the Criminal Justice System (Dec. 10, 2015), *available at* http://www.arnoldfoundation.org/.
laura-and-john-arnold-foundation-addresses-use-of-fines-and-fees-in-the-criminal-justice-system.
17. To date, lawsuits challenging practices that unconstitutionally jail poor people for non-payment of criminal justice debt have been filed in Alabama, Mississippi, Georgia, Missouri, Louisiana, and Washington, *See, e.g.*, Alexander City Complaint, *supra* note 14 (alleging that the Alexander City, Alabama jailed people for failure to pay criminal justice debt that they could not afford); Biloxi Complaint, *supra* note 14 (challenging debtors' prisons in Mississippi); Class Action Complaint, *Cain v. City of New Orleans*, No. 2:15-cv-04479-SSV-JCW (E.D. La. Sept. 21, 2015), *available at* http://equaljusticeunderlaw.org/wp/wp-content/uploads/2015/04/First-Amended-Complaint-9-22-15.pdf (alleging that practices in New Orleans created unconstitutional debtors' prisons and conflicts of interest) [hereinafter City of New Orleans Complaint]; Class Action Complaint, *Fant v. City of Ferguson*, No. 4:15-cv-00253 (E.D. Mo. Feb. 18, 2015), *available at* http://equaljusticeunderlaw.org/wp/wp-content/uploads/2015/02/Complaint-Ferguson-Debtors-Prison-FILE-STAMPED.pdf (alleging that Ferguson, Missouri residents were jailed based on their inability to pay criminal justice debt); Class Action Complaint, Edwards v. Red Hills Community Probation, LLC et al., No. 1:15-cv-67-LJA (M.D. Ga. April 10, 2015), *available at* https://www.schr.org/files/post/files/Doc%20%201%20-%20Complaint.pdf (alleging that probationers were subject to jail based on their inability to pay fines and probation supervision fees to a private probation company);

Complaint, *Fuentes et al., v. Benton County*, No. 15-2-02976-1 (Wash. Super. Ct. Oct. 6, 2015), *available at* https://www.aclu.org/sites/default/files/field_document/fuentes_v._benton_county_-_complaint.pdf.

18. *See* White House Council of Econ. Advisers, *Fines, Fees, and Bail: Payments in the Criminal Justice System that Disproportionately Impact the Poor* (December 2015), *available at* https://www.whitehouse.gov/sites/default/files/page/files/1215_cea_fine_fee_bail_issue_brief.pdf; Vanita Gupta & Lisa Foster, U.S. Dep't of Justice, Civil Rights Div., *Dear Colleague Letter* (March 14, 2016), *available at* https://www.justice.gov/crt/file/832461/download; Joint Mot. For Entry of Settlement Agreement ¶¶ 85-91, *United States v. Hinds County*, No. 3:16-cv-00489 (S.D. Miss. June 23, 2016).
19. *See, e.g.*, Harris, *supra* note 12, at 123 (analyzing five counties in Washington State and finding that "the distinctive punishment culture of each county is reflected in how its officials structure and implement monetary sanctions" and that "[t]he nature and severity of punishment practices depend on local culture and that both the interpretation and enforcement of state law depend on where it is being applied, and to whom").
20. Harvey et al., *supra* note 15, at 4.
21. This is in keeping with the work of other advocacy organizations, including the Brennan Center for Justice and the Texas Fair Defense Project, and scholars. *See, e.g.*, Bannon et al., *supra* note 13; Texas Fair Defense Project, *Criminal Justice Debt* (2016), *available at* http://www.fairdefense.org/criminal-justice-debt; Neil L. Sobol, *Charging the Poor: Criminal Justice Debt & Modern-Day Debtors' Prisons* 75 Md. L. Rev. 186 (2016).
22. *See, e.g.*, Katherine Beckett, et al., Wash. State Minority and Justice Comm'n, *The Assessment and Consequences of Legal Financial Obligations in Washington State* (Aug. 2008), *available at* http://seattletimes.nwsource.com/ABPub/2009/02/24/2008780289.pdf; Council of State Gov'ts Justice Ctr., *Legal Financial Obligations* (2016), *available at* https://csgjusticecenter.org/courts/legal-financial-obligations/.
23. *See, e.g.*,, Alexes Harris, *The Cruel Poverty of Monetary Sanctions*, The Society Pages, Mar. 4, 2014, *available at* https://thesocietypages.org/papers/monetary-sanctions.
24. *See, e.g.*, Am. Civil Liberties Union, *supra* note 4, at 1.
25. *See, e.g.*, Am. Civil Liberties Union, *Ending Modern-Day Debtors' Prisons* (2016), *available at* https://www.aclu.org/feature/ending-modern-day-debtors-prisons.
26. *See* Micah West, *Financial Conflicts of Interest and the Funding of New Orleans's Criminal Courts*, 101 Cal. L. Rev. 521 (2013).
27. La. Rev. Stat. Ann. § 13:2496.4.
28. *Id.* § 13:1312.
29. *Id.* § 13:1381.4.
30. *Id.* § 13:2507.1, repealed by Acts 2014, No. 845, § 2, and re-codified at §13:2496.4, eff. Jan. 1, 2017 (joining the municipal and traffic courts in New Orleans and their respective judicial expense funds into a single consolidated court).
31. *Id.* §13:1595.2.
32. *Id.* §§ 13:1381.4A.(1)-(2), 32:393, 13:2501.1, amended and reenacted by Acts 2014, No. 845, § 2, eff. Jan. 1, 2017.
33. *Id.* § 22:822.
34. *See* §§ 13:2507.1, 13:2496.4, *supra* note 30.
35. *Id.*
36. *Id.* § 13:1381.4.
37. *Id.* §§ 13:2507.1, 13:2496.4, *supra* note 30.
38. *Id.* at 533-34.
39. *Augustus v. Roemer*, 771 F. Supp. 1458, 1473 (E.D. La. 1991).
40. *Id.* at 1473.

41. City of New Orleans Complaint, *supra* note 17.
42. *See, e.g.*, *Connally v. Georgia*, 429 U.S. 245, 251 (1977) (holding that the issuance of a warrant violated the Fourth and Fourteenth Amendments where justices of the peace received $5 compensation for each application for a search warrant only if the warrant was issued); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927) (holding that a village mayor serving as judge may not be paid from fees based on a defendant's conviction because "[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law"); *Brown v. Vance*, 637 F.2d 272, 286 (5th Cir. 1981) (finding that a statute in which judges were paid based on the number of cases filed in their court violated due process because it encouraged judges to curry favor with law enforcement); *West Virginia ex rel. Osborne v. Chinn*, 121 S.E.2d 610, 615-16 (W.V. 1961) (holding that a statute which authorized judges to be paid out of a fund made up of fines from cases that they tried violated the Due Process Clause).
43. *See Tumey v. Ohio*, 273 U.S. 510, 532-33 (1927) ("With his interest, as mayor, in the financial condition of the village, and his responsibility therefor, might not a defendant with reason say that he feared he could not get a fair trial or a fair sentence from one who would have so strong a motive to help his village by conviction and a heavy fine?"); *Dugan v. Ohio*, 277 U.S. 61, 65 (1928) (analyzing the possibility, though not present in the case at hand, where a mayor with judicial powers has competing duties within his roles); *Ward v. Village of Monroeville*, 409 U.S. 57, 2 (1972) (finding that a "mayor's executive responsibilities for village finances may make him partisan" and compromise his dual role as judge); *Rose v. Village of Peninsula*, 875 F.Supp. 442, 452 (1995) (clarifying that "the amount of mayor's court fee revenues is just one measure of whether the mayor may reasonably be questioned as being impartial" where judicial and executive functions overlap); *Village of Covington v. Lyle*, 433 N.E. 2d 597 (1982).
44. Gordon M. Griller et al., National Ctr. for State Courts, *Missouri Municipal Courts: Best Practice Recommendations*, 26-27 (November 2015), *available at* https://www.courts.mo.gov/file.jsp?id=95287.
45. *Ferguson Report*, *supra* note 7, at 10.
46. Supreme Court of Missouri, Municipal Division Work Group, *Report to the Supreme Court of Missouri* 18 (March 1, 2016), *available at* https://www.courts.mo.gov/file.jsp?id=98093 [hereinafter Missouri Municipal Division Work Group].
47. *Id.* at 24.
48. *Id.* at 26.
49. *Id.* at 79.
50. *Id.* at 81.
51. Conference of State Court Adm'rs, *Standards Relating to Court Costs: Fees, Miscellaneous Charges and Surcharges and a National Survey of Practice* 4-5 (June 1986), *available at* http://cdm16501.contentdm.oclc.org/cdm/ref/collection/financial/id/81 [hereinafter *Standards Relating to Court Costs*]; West, *supra* note 26, at 529.
52. Conference of State Court Adm'rs, *Position Paper on State Judicial Branch Budgets in Times of Fiscal Crisis* 15 (December 2003).
53. Bannon et al., *supra* note 13, at 7.
54. Reynolds & Hall, *supra* note 2, at 9.
55. S.C. Code Ann. §§ 56-5-2995, 14-1-201. *See also* Tex. Code Crim. Proc. Ann. Art. 102.014 ($2-$20 cost imposed on offense on violations in school crossing zones to be used in the school crossing guard program); Tenn. Code Ann. § 39-17-439 ($100 alcohol and drug addiction treatment fee paid to the alcohol and drug addiction treatment fund); Wash. Rev. Code § 10.99.080 ($100 domestic violence penalty to fund domestic violence advocacy, prevention and prosecution programs).

56. Maura Ewing, *Want to Clear Your Record? It Will Cost You $450*, Marshall Project (June 1, 2016), *available at* https://www.themarshallproject.org/2016/05/31/want-to-clear-your-record-it-ll-cost-you-450?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20160601-499#.LJenWiIJd.
57. *Id.*
58. *See, e.g.*, Tenn. Code Ann. §§ 40-24-107; 16-18-305.
59. *Id.* § 67-4-606.
60. *In for a Penny*, *supra* note 15, at 60-61.
61. *See, e.g.*, *Developments in the Law: Policing and Profit*, 128 Harv. L. Rev. 1723 (2015) [hereinafter *Policing and Profit*]; Sarah Stillman, *Get Out of Jail, Inc.*, The New Yorker, June 23, 2014, *available at* http://www.newyorker.com/magazine/2014/06/23/get-out-of-jail-inc; Terry Carter, *Privatized Probation Becomes A Spiral of Added Fees and Jail Time*, A.B.A. J., Oct. 1, 2014, *available at* http://www.abajournal.com/magazine/article/probationers_prison_privatized_supervision_becomes_a_spiral_of_added_fees_j; Human Rights Watch, *Profiting From Probation: America's "Offender-Funded" Probation Industry* 29 (2014), *available at* https://www.hrw.org/sites/default/files/reports/us0214_ForUpload_0.pdf [hereinafter Human Rights Watch]. In Montana, the offender-funded model is statutorily required. *See* Mont. Code Ann. § 46-23-1005(3).
62. Human Rights Watch, *supra* note 61, at 44-45.
63. *See, e.g.*, Cal. Penal Code §§ 1204 (West 2016), 1463.007, 1463.010; Fla. Stat. Ann. § 938.35; Tenn. Code Ann. §§ 40-24-105, 40-28-205; Wash. Rev. Code §§ 3.02.045, 9.94A.760, 36.18.190; Nev. Rev. Stat. § 176.064; Tex. Code Crim. Proc. Ann. Art 103.0031; Ga. Code Ann. § 15-21-12; Ala. Code § 12-17-225.7; Miss. Code Ann. § 19-3-41(2); Mont. Code Ann. § 46-17-402.
64. *See, e.g.*, Cal. Penal Code § 1205(e) (imposition of a fee not exceeding $30 paid to collecting agency); Fla. Stat. §§ 28.246(6), 938.35 (collection fee of up to 40%); Nev. Rev. Stat. § 176.064(2)(c) (the collection agency's compensation is capped at the amount of the collection fee); Tenn. Code Ann. § 40-24-105(d)-(e) (collection agency fee of up to 40%); Tex. Code Crim. Proc. Ann. art. 103.0031(b) (collection fee of up to 30% may be authorized); Wash. Rev. Code §§ 3.02.045 (agreements with collection agencies may authorize the retention of any portion of the interest collected on debts), 9.94a.760(12) (the cost of collection services during a period of community supervision to be paid by the offender), 36.18.190 (agreements with collection agencies may authorize the retention of any portion of the interest collected on debts).
65. Fla. Stat. Ann. §§ 28.246(6) (West 2016), 938.35 (West 2016); Tenn. Code Ann. § 40-24-105(d)-(e) (West 2016); *see* Rebekah Diller, Brennan Ctr. for Justice, *The Hidden Costs of Florida's Criminal Justice Fees* 21 (2010), *available at* http://www.brennancenter.org/sites/default/files/legacy/Justice/FloridaF&F.pdf.
66. Iowa Code §§ 321.40(9), 321.210B (empowering private debt collection designees to enter and create installment payment agreements with debtors in default and ordering that holds on licensing and vehicle registration be lifted if private designee notifies the county treasurer that a satisfactory agreement has been made).
67. Missouri Municipal Division Work Group, *supra* note 47, at 80-81 (recommending that the Missouri General Assembly give municipalities authority to raise revenue through taxes, rather than court costs, fees, and surcharges, in order to pay for law enforcement).
68. S. B. 5, 98th Gen. Assemb., Reg. Sess. (Mo. 2015) (enacted), inserting § 479.359.
69. *Id.*
70. Jennifer S. Mann, *Muni Court Reform Law Takes Effect Friday; Many Warrants, Fines Are Being Cancelled Early*, St. Louis Post-Dispatch, Aug. 23, 2015, *available at* http://www.stltoday.com/news/local/crime-and-courts/muni-court-reform-law-takes-effect-friday-many-warrants-fines/article_a790197b-b58b-548a-9616-934a36649358.html.
71. Alex Stuckey, *Cap on Non-Traffic Violation Revenue Passed by Missouri Senate*, St. Louis Post-Dispatch,

Jan. 28, 2016, *available at* http://www.stltoday.com/news/local/govt-and-politics/cap-on-non-traffic-violation-revenue-passed-by-missouri-senate/article_093cffb2-67a6-54f6-97b8-7bc6f4e3a986.html.

72. Okla. Stat. Ann. tit. 47, § 2-117, D-E.
73. H.B.1400, § 3-6.05, 2015 Leg., (Va. 2015) (funds in excess of revenue caps are directed to the state's Literary Fund).
74. Fla. Stat. § 316.660. In Florida, however, the consequence of exceeding the revenue cap from traffic citations is that the municipality or county is required to submit a report to the Legislative Auditing Committee. It is questionable whether this reporting requirement is sufficient to alter incentives.
75. A.B.A. Comm. on State Court Funding, *Black Letter Recommendations* (2004); Reynolds & Hall, *supra* note 2, at 7. *See also* David Bresnick, *Revenue Generation By the Courts, in* Handbook of Court Administration and Management, 355, 359 (Steven W. Hays & Cole Blease Graham, Jr. eds., 1993); Griller et al., *supra* note 44, at 26; Nat'l Ctr. for State Courts, State of Oregon, *Report to the Joint Interim Committee on State Justice System Revenues* 63 (October 2010), *available at* http://library.state.or.us/repository/2010/201011300919042/index.pdf; Wisconsin Supreme Court Planning and Policy Comm., *Final Report to the Planning and Policy Advisory Committee of the Wisconsin Supreme Court* (February 2005); Missouri Municipal Division Work Group, *supra* note 46, at 78.
76. Reynolds & Hall, *supra* note 2, at 8-9.
77. States with unified judicial systems include Alabama, Alaska, Arizona, Connecticut, Florida, Georgia, Idaho, Illinois, Kansas, Kentucky, Michigan, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Vermont, Virginia and Wisconsin, *see* Nat'l Ctr. for State Courts, *Court Unifi ation: State Links*, *available at* http://www.ncsc.org/Topics/Court-Management/Court-Unification/State-Links.aspx?cat=States%20Legally%20Described%20as%20Unified.
78. For example, Florida's Constitution provides that all funding for the offices of the clerks of the circuit and county courts shall be provided by filing fees for judicial proceedings and service charges and costs for performing court-related functions. F.S.A. Const. art. 5 § 14.
79. Reynolds & Hall, *supra* note 2, at 8.
80. *Standards Relating to Court Costs*, *supra* note 51, at 7-8.
81. This was done by Virginia in 1994. *See* Rebekah Diller, et al., Brennan Ctr. for Justice, *Maryland's Parole Supervision Fee: A Barrier to Reentry* 22-23 (2009), *available at* https://www.brennancenter.org/sites/default/files/legacy/publications/MD.Fees.Fines.pdf.
82. Fla. Stat. Ann. §§ 775.083 (court costs of $50 or $20 for county crime prevention), 938.055 ($100 fine to the Operating Trust Fund of the Department of Law Enforcement to be used by the state wide criminal analysis laboratory system), 938.01 ($3 court cost deposited into the Additional Court Cost Clearing Trust Fund, 92% allocated to the Department of Law Enforcement Criminal Justice Standards and Training Trust Fund,); Ga. Code Ann. §§ 15-21-73, 15-21-74 (West 2016) (additional assessment to be appropriated to fund law enforcement); La. Stat. Ann. § 15.571.11, *amended by* 2016 La. Sess. Law Serv. Act 233 (H.B. 79) (12% of criminal justice debt amount distributed to the sheriff's general fund); Ky. Rev. Stat. Ann. § 24A.176 (distribution of costs for criminal cases for payment of expenses for operation of the local government's police department or contracted police services); Iowa Code § 911.3 (law enforcement initiative surcharge of $125); Mo. Rev. Stat. § 488.5336 (surcharges for police officer training); N.H. Rev. Stat. Ann. § 504-A:13 (West 2016) ($5 of the probation supervision fee allocated to the police training fund); Tenn. Code § 39-17-428 (50% of mandatory minimum fines for drug offences to the agency responsible for the investigation and arrest).
83. Tenn. Code § 39-17-428 (c)(1).
84. *See Ferguson Report*, *supra* note 7, at 10.
85. *See, e.g.*, Tex. Code Crim. Proc. Ann. art. 102.012(a) (West 2015); Okla. Stat. Ann. tit. 22, §§ 305.1,

991d(A)(2)(West 2016).

86. Wayne A. Logan & Ronald F. Wright, *Mercenary Criminal Justice*, 2014 U. Ill. L. Rev. 1175, 1188. *See, e.g.,* D.C. Code § 5-335.01 (2016) (describing a "post-and-forfeiture" system); Pam Louwagie, *Some Drivers Find that Cash Can Make the Ticket Go Away,* Star Tribune, April 16, 2012, *available at* http://www.startribune.com/some-drivers-find-that-cash-can-make-the-ticket-go-away/144099386/.
87. Cal. Gov't Code § 29550.1; Colo. Rev. Stat. § 30-1-104; Mich. Comp. Laws. § 801.4b; Minn. Stat. ann. § 641.12; Ohio Rev. Code Ann. § 341.12; Wash. Rev. Code Ann § 70.48.390. *See Markadonatos v. Village of Woodridge*, 760 F.3d 545 (7th Cir. 2014) (divided opinion as to whether local booking fees only apply on conviction).
88. *See Policing and Profit, supra* note 61; *see also* Katherine Baicker & Mireille Jacobson, *Finders Keepers: Forfeiture Laws, Policing Incentives, and Local Budgets*, 91 J. of Pub. Econ. 2113 (2007).
89. *See* Logan & Wright, *supra* note 86, at 1187-88.
90. Griller, *supra* note 44, at 6.
91. *Id.* at 7.
92. Missouri Municipal Division Work Group, *supra* note 46, at 81-82.
93. Pa. Dep't of Corrs., *Budget Request FY 15-16, Testimony before House Appropriations Committee* (March 2015), *available at* http://www.pabudget.com/Display/SiteFiles/154/Documents/FY%20 2015-16%20GF%20Budget/Hearings/Written%20Submitted%20Testimony/Corrections%20 Testimony.pdf.
94. Inimai Chettiar et al., Brennan Ctr. for Justice, *Reforming Funding to Reduce Mass Incarceration* 15 (2013), *available at* https://www.brennancenter.org/sites/default/files/publications/REFORM_FUND_MASS_INCARC_web_0.pdf.
95. Criminal Justice Court Servs. Office (CA), *SB 678 Year 2 Report: Implementation of the California Community Corrections Performance Incentives Act of 2009* (2012), *available at* http://www.courts.ca.gov/documents/SB678-Year-2-report.pdf.
96. Chettiar et al., *supra* note 94, at 16.
97. Human Rights Watch, *supra* note 62, at 62 (discussing the need for government oversight of private probation companies, and examining GA's County and Municipal Probation Advisory Council); H.B. 310, 153rd Gen. Assemb. Reg. Sess. (Ga. 2015).
98. *See, e.g.,* Walter Johnson, *Ferguson's Fortune 500 Company,* Atlantic, Apr. 26, 2015, *available at* http://www.theatlantic.com/politics/archive/2015/04/fergusons-fortune-500-company/390492/ (drawing a connection between the town's failure to tax a Fortune 500 company and the town's pattern of policing for revenue). *See also Ferguson Report, supra* note 7 at 10.
99. *See, e.g., Ferguson Report, supra* note 7, at 4 (noting a "particular hardship" for the "most vulnerable residents, especially upon those living in or near poverty").
100. *See generally,* Jessica Eaglin & Danyelle Solomon, Brennan Ctr. for Justice, *Reducing Racial and Ethnic Disparities In Jails: Recommendations For Local Practice*, 9–27 (2015); *available at* https://www.brennancenter.org/sites/default/files/publications/Racial%20Disparities%20Report%20062515.pdf.
101. *See, e.g.,* Cal. Penal Code § 370 (prohibiting people from "obstruct[ing] the free passage of any . . . public park, square, street, or highway").
102. *See, e.g.,* Ga. Code Ann. § 40-5-70 (providing for a fine of at least $200 and mandatory driver's license suspension).
103. Chris Francescani, *Loose Cigarette Arrests in NYC Drop in Year After Eric Garner's Death*, Wall St. J. (July 15, 2015), *available at* http://www.wsj.com/articles/loose-cigarette-arrests-in-nyc-drop-in-year-after-eric-garners-death-1436992014.
104. *See, e.g.,* Karen Dolan & Jodi L. Carr, Inst. for Policy Studies, *The Poor Get Prison: The Alarming Spread of the Criminalization of Poverty* 23–26 (2015), *available at* http://www.ips-dc.org/wp-content/uploads/2015/03/IPS-The-Poor-Get-Prison-Final.pdf (chronicling the increasing

criminalization of poverty); Douglas N. Evans, John Jay College of Criminal Justice, *The Debt Penalty: Exposing The Financial Barriers to Offender Reintegration* (2014), *available at* https://jjrec.files.wordpress.com/2014/08/debtpenalty.pdf.

105. *See, e.g.*, N.H. Rev. Stat. Ann. § 490:26-a(II-a) ( "The supreme court may establish by rule an equitable fee of not less than $25 to be added to a fine whenever a court extends the time for the payment of the fine." Such a fee "shall be paid prior to or simultaneously with the payment of the fine.").
106. For example, defendants in Iowa can, with the court's permission, enter into an installment payment plan. *See* Iowa Code § 909.3. If, however, a defendant fails to pay a monthly installment payment within 30 days, the total court debt is considered delinquent and up to 25% of the debt may be added to the delinquent amount. *See* Iowa Ct. R. 26.6 (2016).
107. *See, e.g.*, N.J. Stat. Ann. § 40:23-6.53 (providing that up to 22% of any amount collected can be imposed as a collection fee). Collection costs function as a poverty penalty when they are only imposed on individuals who are unable to pay their financial obligations when imposed and are therefore subject to collection procedures.
108. *See, e.g.*, La. Code Crim. Proc. Ann. art. 886(a) (providing unspecified "judicial interest" for unpaid fines "plus all costs of the criminal proceeding and subsequent proceedings necessary to enforce the judgment in either civil or criminal court, or both").
109. *See, e.g.*, N.H. Rev. Stat. Ann. § 490:26-a(II-a) (authorizing a $25 fee for late payments or payment plans).
110. *See, e.g.*, Cal. Penal Code § 1205(b) ("If time has been given for payment or it has been made payable in installments, the court *shall*, upon any default in payment, immediately order the arrest of the defendant and order him or her to show cause why he or she should not be imprisoned. If the fine, restitution order, or installment, is payable forthwith and it is not so paid, the court *shall without further proceedings*, immediately commit the defendant to the custody of the proper office to be held in custody until the fine or the installment thereof, as the case may be, is satisfied in full.") (emphasis added).
111. *See, e.g.*, Minn. Stat. § 588.02 (providing courts with significant latitude to "punish a contempt by fine or imprisonment, or both").
112. *See, e.g.*, Ga. Code Ann. § 42-8-103 (providing for "pay-only probation" which "means a defendant has been placed under probation supervision solely because such defendant is unable to pay the court imposed fines and statutory surcharges when such defendant's sentence is imposed").
113. *See* Sobol, *supra* note 21, at 75.
114. *See* Lawyers Comm. for Civil Rights of the San Francisco Bay Area, *Not Just a Ferguson Problem: How Traffic Courts Drive Inequality in California* 9 (2016), *available at* http://www.lccr.com/wp-content/uploads/Not-Just-a-Ferguson-Problem-How-Traffic-Courts-Drive-Inequality-in-California-4.20.15.pdf [hereinafter *Not Just a Ferguson Problem*]; *see also* Joseph Shapiro, *How Driver's License Suspensions Unfairly Target The Poor*, NPR, Feb. 6, 2015, *available at* http://www.npr.org/2015/01/05/372691918/how-drivers-license-suspensions-unfairly-target-the-poor.
115. California alone suspended four million licenses in 2014. Lawyers Comm. For Civil Rights, *supra* note 114 at 4.
116. *See* Jessica Eaglin, *Driver's License Suspensions Perpetuate the Challenges of Criminal Justice Debt*, Brennan Ctr. for Justice (Apr. 30, 2015); Shapiro, *supra* note 123.
117. *See* Am. Ass'n of Motor Vehicle Adm'rs, *Best Practices Guide to Reducing Suspended Drivers* 2 (2013), *available at* http://www.aamva.org/Suspended-and-Revoked-Drivers-Working-Group/ (finding that "suspending driving privileges for non-highway safety related reasons is not effective" and that "the costs of arresting, processing, administering, and enforcing social nonconformance related driver license suspensions create a significant strain on budgets and other resources and detract from highway and public safety priorities").

118. *Id.* at 17–18.
119. These suspensions inhibit the ability of government to collect amounts due from indigent persons while imposing a significant "burden on departments of motor vehicles, law enforcement, the courts and society. DMVs for example, incur exorbitant costs to create, program, and process these newly legislated suspension types." *See id.* at 2.
120. *Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that driver's licenses "may become essential in the pursuit of a livelihood" and "are not to be taken away without that procedural due process required by the Fourteenth Amendment"); *cf. Dixon v. Love*, 431 U.S. 105 (1977) (holding that Illinois driver's license suspension statute, which allowed for summary revocation of licenses where someone was repeatedly convicted of traffic offenses, comported with due process); *Mackey v. Montrym*, 443 U.S. 1 (1979) (upholding Massachusetts summary driver's license suspension procedure because there is an immediate postsuspension hearing); *see also* Gupta & Foster, *supra* note 18, at 6 ("If a defendant's driver's license is suspended because of failure to pay a fine, such a suspension may be unlawful if the defendant was deprived of his due process right to establish inability to pay. . . . Accordingly, automatic license suspensions premised on determinations that fail to comport with Bearden and its progeny may violate due process.") (citations omitted).
121. *See* Bannon et. al., *supra* note 13, at 13-17.
122. 124. *Id.* at 20–25.
123. *See* Gupta & Foster, *supra* note 18; *Not Just a Ferguson Problem*, *supra* note 114.
124. *See* Nagrecha, et. al., *supra* note 15; deVuono-powell, et al., *supra* note 15, at 9; Diller, *supra* note 65, at 16 (finding that where amounts are not linked to an ability to pay, courts functionally require family, friends, or employers to put up the required money).
125. deVuono-powell, et al., *supra* note 15, at 27–28.
126. As an example, in the student loan repayment context, debtors are entitled to deferments in certain situations and may not be liable for interest payments during the deferment. *See generally* Nat'l Consumer Law Ctr., *Student Loan Law, 4.3 Deferments* (5th ed. 2015).
127. A similar safeguard is used in the student loan context, where borrowers are entitled to economic hardship deferments (with no interest accrual on subsidized government loans) for up to 3 years over the life of their repayment based on being unemployed, receiving public assistance benefits or working full-time but making less than 150% of poverty guidelines. *See* 34 C.F.R. §§ 682.210(s)(6) (2016) (FFEL), 685.204(g) (2016) (Direct Loan). Debtors can apply for a deferment by completing a simple form or speaking with their servicer over the phone.
128. *See* Michael D. Thompson & Rachel L. McLean, Council of State Gov'ts, Justice Ctr., Bureau of Justice Assistance, *Repaying Debts*, 22–23 (2007).
129. In New Jersey, the Motor Vehicles Affordability and Fairness Task Force Report recommended against using drivers' license suspension as collection tool for indigent people and contained a number of policy recommendations. *See* Motor Vehicle Affordability Fairness and Taskforce, *Final Report* (2006), *available at* http://www.state.nj.us/mvc/pdf/About/AFTF_final_02.pdf.
130. *See* Am. Ass'n of Motor Vehicle Adm'rs, *supra* note 117, at 2–3.
131. *See* Jobs with Justice, *State Laws and Statutes That Suspend Professional Licenses and Certificates* (2014), *available at* http://www.jwj.org/wp-content/uploads/2015/02/State-Laws-and-Statutes-That-Suspend-Professional-Licenses-and-Certificates.pdf (compiled by the National Consumer Law Center).
132. 134. *Id.* at 18–19.
133. Alternatives for Non-Violent Offenders Task Force, *Report and Recommendations* 2 (2009), *available at* http://leg2.state.va.us/dls/h&sdocs.nsf/By+Year/RD4302009/$file/RD430.pdf (describing a group convened by the Secretary of Public Safety which included "a diverse group of stakeholders from across the criminal justice system, including judges, Commonwealth's Attorneys, sheriffs, police chiefs, regional jail administrators, the DOC, the Attorney General's Office, and the Vir-

ginia Criminal Sentencing Commission, among others").

134. Carl Reynolds, et al., Council of State Gov'ts Justice Ctr & Tex. Office of Court. Admin., *A Framework to Improve How Fines, Fees, Restitution, and Child Support are Assessed and Collected from People Convicted of Crimes Interim Report* 26 (March 2, 2009) (citing Carl Fomoso, *Determining the Collectability of Child Support Arrears* (2003); Vicky Turetsky, Ctr. for Law and Social Policy, *Staying in Jobs and Out of the Underground: Child Support Policies that Encourage Legitimate Work* (March 2007), *available at* http://www.clasp.org/resources-and-publications/files/0349.pdf), *available at* https://csgjusticecenter.org/wp-content/uploads/2013/07/2009-CSG-TXOCA-report.pdf. For an example of a state statute reflective of such a policy, see Or. Admin. R. 255-065-0005(5) (capping collections at 20% of take home salary, unless the defendant has significant liquid assets).
135. *See* Nat'l Consumer Law Ctr., Student Loan Law, 3.3.3.3 *Calculating the IBR, PAY or REPAYE Repayment Amount* (5th ed. 2015).
136. In the student loan repayment context, the balance of a student loan that is repaid through an income-based repayment plan is waived after a certain number of payments have been made. *See* Nat'l Consumer Law Ctr, Student Loan Law, 3.3.3.8 *IBR/PAYE/REPAYE Forgiveness* (5th ed. 2015).
137. *See, e.g.*, Joy Radice, *Administering Justice: Removing Statutory Barriers To Reentry*, 83 U. Colo. L. Rev. 715 (2012) (describing New York state's system of issuing certificates to offenders in order to restore certain rights and privileges).
138. *See* Wash. Rev. Code § 9.94A.760 *et seq.* (providing that the state shall have the same rights in enforcing a civil judgment as any other judgment creditor).
139. Roopal Patel & Meghna Philip, Brennan Ctr. for Justice, *Criminal Justice Debt, a Toolkit for Action* 17–18 (2012), *available at* https://www.brennancenter.org/sites/default/files/legacy/publications/Criminal%20Justice%20Debt%20Background%20for%20web.pdf (comparing fines and fees charged by state and local governments to credit card entities).
140. *See, e.g.*, 15 U.S.C. § 1673. Currently, the federal garnishment limits prohibit garnishment below the lower amount of either 30 times the federal minimum wage or 25% of disposable earnings, meaning roughly post-tax earnings. This means that if someone makes only 30 times minimum wage post-tax, 0% of his or her earnings would be available for garnishment.
141. *See* Daniel Denvir, *Philly Courts Rein In Debt Collection Campaign*, Philadelphia City Paper, Oct. 9, 2014, *available at* http://www.theinvestigativefund.org/blog/2052/philly_courts_rein_in_debt-collection_campaign/.
142. 18 U.S.C. § 3613(b) ("The liability to pay a fine shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment of the person fined, or upon the death of the individual fined.").
143. 146. 18 U.S.C. § 3013(c).
144. Vera Inst. of Justice, *How To Use Structured Fines (Day Fines) as an Intermediate Sanction* (1996), *available at* https://www.ncjrs.gov/pdffiles/156242.pdf.
145. Douglas C. McDonald et al., Nat'l Inst. of Justice, *Day Fines in American Courts: The Staten Island and Milwaukee Experiments*, 2–3 (1992), *available at* https://www.ncjrs.gov/pdffiles1/Digitization/136611NCJRS.pdf.
146. *Id.* at 2.
147. Edwin W. Zedlewski, Nat'l Inst. of Justice, *Alternatives to Custodial Supervision: The Day Fine*, 5–6 (2010), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/230401.pdf.
148. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.").
149. A study conducted by NPR and the Brennan Center in 2014 revealed that 43 states and the District

of Columbia charge fees for public defenders. *See* Emma Anderson et al., *State by State Court Fees*, NPR, May 19, 2014, *available at* http://www.npr.org/2014/05/19/312455680/state-by-state-court-fees. Hawaii, Mississippi, Nebraska, New York, Pennsylvania, Rhode Island, and Utah, do not charge public defender fees, but Hawaii, Mississippi, Nebraska, Rhode Island, and Utah charge other fees for the exercise of Sixth Amendment rights. *See infra* notes 153-160.

150. Some states, including Nebraska, charge defendants a fee for convening a jury. *See, e.g.*, *Shaw v. State*, 22 N.W. 772, 773 (Neb. 1885). Other states, including Rhode Island and Mississippi, charge defendants the "costs of the prosecution," essentially taxing the costs of the trial to the defendant. *See* 12 R.I. Gen. Laws Ann. § 12-21-20(a) ("If, upon any complaint or prosecution before any court, the defendant shall be ordered to pay a fine, enter into a recognizance or suffer any penalty or forfeiture, he or she shall also be ordered to pay all costs of prosecution, unless directed otherwise by law."); Miss. Code. Ann. § 99-19-77.
151. In Washington, defendants must pay a per diem and mileage for their jurors. *See* Wash. Rev. Code §§ 3.50.135, 10.46.190, 35.20.090.
152. *See, e.g.*, Tex. Gov't Code Ann. § 102.021 (charging convicted defendants a mandatory $5 fee for summoning a jury).
153. Hawaii and Utah impose witness fees on defendants who are able to pay. *See* Haw. Rev. Stat. Ann. § 802-7; Utah Code Ann. § 78B-1-150.
154. *See, e.g.*, Tex. Gov't Code Ann. § 102.021 (requiring convicted defendants to pay a mandatory $5 fee for summoning a witness).
155. *See, e.g.*, Mich. Comp. Laws § 769.1f (allowing the court to order the defendant to reimburse "[t]he salaries or wages, including overtime pay, of law enforcement personnel for time spent responding to the incident from which the conviction arose, arresting the person convicted, processing the person after the arrest, preparing reports on the incident, investigating the incident, and collecting and analyzing evidence, including, but not limited to, determining bodily alcohol content and determining the presence of and identifying controlled substances in the blood, breath, or urine"); Mo. Rev. Stat. § 488.029 (charging $150 to convicted defendants where a "crime laboratory makes analysis of a controlled substance").
156. *See, e.g.*, Tenn. Code Ann. § 40-25-123 ("A defendant convicted of a criminal offense shall pay all the costs that have accrued in the cause."); Wash. Rev. Code Ann. § 10.01.160 (allowing courts to charge defendants for "expenses specially incurred by the state in prosecuting the defendant").
157. *See, e.g.*, Mich. Comp. Laws § 769.1k(b)(A)-(C) ("If a defendant enters a plea of guilty or nolo contendere or if the court determines after a hearing or trial that the defendant is guilty, . . . The court may impose any or all of the following: . . . any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following: Salaries and benefits for relevant court personnel. Goods and services necessary for the operation of the court. Necessary expenses for the operation and maintenance of court buildings and facilities.").
158. Joseph Shapiro, *As Court Fees Rise, The Poor Are Paying the Price*, NPR, May 23, 2014, *available at* http://www.npr.org/2014/05/19/312158516/increasing-court-fees-punish-the-poor.
159. Nat'l Legal Aid and Defender Ass'n, *Race to the Bottom: Trial Level Indigent Defense Systems in Michigan* 32 ( June 2008 ), *available at* http://www.nlada.net/sites/default/files/mi_racetothe bottomjseri06-2008_report.pdf.
160. Many states allow courts to impose statutorily-defined fines as a punishment for the commission of a crime, which increase with the seriousness of the conviction. *See, e.g.*, N.H. Rev. Stat. Ann. § 651:2 ("A fine may be imposed in addition to any sentence of imprisonment, probation, or conditional discharge. . . . The amount of any fine imposed on: (a) Any individual may not exceed $4,000 for a felony, $2,000 for a class A misdemeanor, $1,200 for a class B misdemeanor, and $1,000 for a violation."). *See also* Ga. Code Ann. §§ 17-10-3, 17-10-4 (2016); Ind. Code Ann. §§ 35-50-3-1,

35-50-3-2; Iowa Code Ann. §§,902.9, 903.1; Kan. Stat. § 21-6611; Ky. Rev. Stat. Ann. § 534.040; Mich. Comp. Laws Ann. §§ 750.503, 750.504, 750.505; Neb. Rev. Stat. § 28-106; Nev. Rev. Stat. §§ 193.130, 564.150; S.D. Codified Laws §§ 22-6-1, 22-6-2; Tenn. Code Ann. § 40-35-111; Tex. Penal Code Ann., §§ 12.21–12.23=, 12.32–12.35; Wash. Rev. Code §§ 9.92.010, 9.92.020, 9.92.030. This system of tiered fines creates an incentive for defendants to plead guilty to lesser included offenses and forgo trial, rather than risk the higher financial penalty of conviction of a more serious offense.

161. Many states charge defendants and convicted persons a fee for, or the actual costs of, their incarceration, including heath care costs. *See, e.g.*, S.D. Codified Laws § 24-2-28 (charging incarcerated persons "the cost of the inmate's confinement which includes room and board charges; medical, dental, optometric, and psychiatric services charges; vocational education training; and alcoholism treatment charges"). *See also* Cal. Penal Code §§ 1203.1m(a), 1209, 1209.5; Fla. Stat. § 951.033; Ga. Code Ann. §§ 42-1-4, 42-4-51, 42-4-71, 42-5-55; Ky. Rev. Stat. Ann. § 534.040; La. Code Crim. Proc. Ann. art. 890.2; Mich. Comp. Laws Ann. § 774.22c; Minn. Stat. § 244.18; Tex. Code Crim. Proc. Ann. § art. 42.038; Wash. Rev. Code § 9.94A.760. Thus, defendants who go to trial are risking substantially more expensive sentences due to longer periods of incarceration.

162. Lindsay Devers, Bureau of Justice Assistance, *Plea and Charge Bargaining: Research Summary* (2011), *available at* https://www.bja.gov/Publications/PleaBargainingResearchSummary.pdf.

163. *See* Ann K. Wagner, *The Conflict over Bearden v. Georgia in State Courts: Plea-Bargained Probation Terms and the Specter of Debtors' Prison*, 2010 U. Chi. Legal F. 383, 387-88 (2010).

164. *Compare U.S. v. Zink*, 107 F.3d 716, 719-20 (9th Cir. 1997) ("Although it is questionable whether the record suggests that Zink may be able to pay the [$5.8 million] of restitution ordered, Zink's clear acquiescence in the restitution order relieved the district court of any independent obligation to further determine Zink's ability to pay restitution. Under these circumstances, we cannot say that the restitution order seriously affects the fairness, integrity, or public reputation of Zink's proceedings, such that the order amounts to 'plain error.'"); *State v. Nordahl*, 680 N.W.2d 247, 251-52 (N.D. 2004) (holding that "[i]f a defendant agrees to restitution as part of a plea agreement, he is not entitled to a hearing to determine whether he has the ability to pay restitution" at the time of revocation, because ability to pay is considered at sentencing); *and Dickey v. State*, 570 SE2d 634, 636 (Ga. Ct. App. 2002)(holding that probation could be revoked for failure to pay restitution, where the restitution payments were negotiated as part of a plea agreement.), *with Jordan v. State*, 939 S.W.2d 255 (Ark. 1997) (holding that in the context of plea bargained restitution, "[w] here there is no determination that the failure to pay restitution is willful, it is clear that a probationer cannot be punished by imprisonment solely because of a failure to pay.") *and Cain v. City of New Orleans*, 2016 WL 2962912 *7 (E.D. La. May 23, 2016) (order denying defendants' motion to dismiss) (finding that *Nordahl* can be distinguished from cases involving a change in circumstances in ability to pay and cases involving "mandatory financial obligations," which "a criminal defendant cannot voluntarily offer to pay").

165. *See* Amer. Bar Ass'n, A.B.A. Standards for Criminal Justice, *Standard 14-4.1 Diversion and Other Alternative Resolutions, available at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_guiltypleas_blkold.html ("An offender's eligibility to participate in diversion should not depend on his or her ability to pay restitution or other costs."). *See also Dirico v State*, 728 So.2d 763, 767 (Fla. Dist. Ct. App 1999) (finding plea bargain provision stating"Defendant specifically waives ability to argue inability to pay and acknowledges that failure to meet this restitution schedule will result in the imposition of the suspended sentence" violated the Fourteenth Amendment).

166. *See* Ctr. for Court Innovation, Red Hook Community Justice Ctr., *available at* http://www.courtinnovation.org/project/red-hook-community-justice-center (last visited Aug. 14, 2016). Critics have expressed concern about the potential net-widening effect of drug courts, in

particular. *See* Eric J. Miller, *Embracing Addiction: Drug Courts and the False Promise of Judicial Interventionism*, 65 Oh. St. L. J. 1479 (2004). *See also*, Allegra McLeod, *Decarceration Courts: Possibilities and Perils of a Shifting Criminal Law*, 100 Geo. L. J. 1587 (2012).

167. *See* Ed Spillane, *Why I Refuse to Send People to Jail for Failure to Pay Fines*, Wash. Post, April 8, 2016, *available at* https://www.washingtonpost.com/posteverything/wp/2016/04/08/why-i-refuse-to-send-people-to-jail-for-failure-to-pay-fines/?utm_term=.03c81ae5de2. Judge Spillane, the presiding judge of the College Station Municipal Court and president of the Texas Municipal Courts Association, described the kind of situation in which he uses discretion to avoid an unjust imposition of criminal justice debt: "Melissa J. not only couldn't pay her fines, but she also couldn't be away from her children at night or on weekends, since she couldn't afford child care. So we set her up on a small payment plan, an arrangement that sometimes works for poor defendants. When it later became apparent that she could not afford that, we waived the fine—but only after she took a free class on the use of child safety seats, addressing what was arguably the most concerning charge against her." *Id.*

168. At least one scholar has raised concerns about the constitutionality under the Thirteenth Amendment of using community service as an alternative to certain types of criminal justice debt. *See* Noah Zatz, *A New Peonage?: Pay, Work, or Go to Jail*, 39 Seattle U. L. Rev. 927, 931 (2016). The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. Zatz has suggested that community service imposed as a means to satisfy certain fees may not qualify for the "punishment for crime" exemption to that constitutional mandate, and thus constitutes involuntary servitude. Zatz, *supra* at 932-33. No judicial decisions, however, have considered that proposition.

169. *See, e.g.*, Ga Code Ann. § 42-8-102(d) (authorizing judges to assign a dollar value equivalent to the current federal minimum wage or higher to each hour of community service).

170. For an early report discussing these concerns, see Rolando V. del Carmen & Eve Trook-White, Nat'l Inst. of Corrs., *Liability Issues in Community Service Sanctions* (1986), *available at* https://s3.amazonaws.com/static.nicic.gov/Library/004534.pdf.

171. Adam Liptak, *Debt to Society is Least of Costs for Ex-Convicts*, N.Y. Times, Feb. 23, 2006, *available at* http://www.nytimes.com/2006/02/23/us/debt-to-society-is-least-of-costs-for-exconvicts.html (documenting policies that require probationers to purchase insurance at the rate of $15 per week in order to participate in court-ordered community service).

172. *See* John B. Mitchell & Kelly Kunsch, *Of Driver's Licenses and Debtor's Prison*, 4 Seattle J. Soc. Just. 439, 465 (2005).

173. New York State, Div. of Criminal Justice Servs., *Community Service Standards, available at* http://www.criminaljustice.ny.gov/opca/communityservicestandards.htm. (last visited Aug. 14, 2016).

174. *See generally* William R. Wood, *Correcting Community Service: From Work Crews to Community Work in a Juvenile Court*, 29 Justice Quarterly 684 (2012).

175. *Id.*

176. Editorial Board, *A Counter-Productive Fee*, Baltimore Sun, Apr. 18, 2011, *available at* http://articles.baltimoresun.com/2011-04-18/news/bs-ed-parole-20110418_1_fee-parole-and-probation-prisoner.

177. *See, e.g.*, Lauren-Brooke Eisen, *Charging Inmates Perpetuates Mass Incarceration*, Brennan Ctr. for Justice (2015), *available at* https://www.brennancenter.org/sites/default/files/blog/Charging_Inmates_Mass_Incarceration.pdf; Am. Civil Liberties Union of Ohio, *In Jail & In Debt: Ohio's Pay-to-Stay Fees* (2015), *available at* http://www.acluohio.org/wp-content/uploads/2015/11/InJailInDebt.pdf.

178. Lisa Riordan Seville & Hannah Rappleye, *Sentenced to Debt: Some Tossed in Prison Over Unpaid Fines*, NBC News (May 27, 2013, 12 :43 AM), *available at* http://inplainsight.nbcnews.

com/_news/2013/05/27/18380470-sentenced-to-debt-some-tossed-in-prison-over-unpaid-fines?lite (describing examples of individuals in Washington and Pennsylvania could not obtain the expungement necessary to continue in their chosen line of work solely because of their inability to pay debts owed to a court).

179. *See, e.g.*, Maura Ewing, *Want to Clear Your Record? It'll Cost You $450*, The Marshall Project (May 31, 2016), *available at* https://www.themarshallproject.org/2016/05/31/want-to-clear-your-record-it-ll-cost-you-450#.kEple42d4.
180. Frederickson & Lassiter, *supra* note 15, at 5.
181. *See* Erika Wood, Brennan Ctr. For Justice, *Restoring the Right to Vote*, 9-11 (2009), *available at* http://www.brennancenter.org/sites/default/files/legacy/Democracy/Restoring%20the%20Right%20to%20Vote.pdf.
182. *See, e.g.*, California Courts, *Traffic Tickets / Infractions Amnesty Program*, (Feb. 21, 2016), *available at* http://www.courts.ca.gov/trafficamnesty.htm; *see also* Iowa Legislative Servs. Agency, *Court Debt Collection Programs and Outstanding Court Debt* 2 (Mar. 17, 2014), *available at* https://www.legis.iowa.gov/docs/publications/IR/25246.pdf.
183. *See* Stacey Hoskins Haynes, et al., *Juvenile Economic Sanctions*, 13 Criminology & Pub. Pol'y 31 (2014).
184. *Id.* at 43.
185. The Pennsylvania study found that approaches to collection varied based on county. In one county, collection attempts ended when the juvenile turned 18. In another county, juveniles were referred to adult probation after they turned 18 and in the third county, collection efforts only occurred if the juvenile re-entered the criminal justice system as an adult. *Id.* at 55.
186. *See* Jessica Feierman et al., Juvenile Law Ctr., *Debtors' Prison for Kids?: The High Cost of Fines and Fees in the Juvenile Justice System* (2016), available at http://debtorsprison.jlc.org/documents/JLC-Debtors-Prison.pdf
187. *Id.*
188. *Id.*
189. *See* Jeffrey Selbin & Stephanie Campos, Berkeley Law Policy Advocacy Clinic, *High Pain, No Gain: How Juvenile Administrative Fees Harm Low-Income Families in Alameda County, California* (Mar. 2016).
190. 193. S. Res. 941 (Cal. 2016).
191. 194. H.R. Res. 1481, Reg. Sess. (Wash.2015).
192. *See* Michigan Supreme Court, *Order No. 2015-12* (May 25, 2016), *available at* http://courts.mi.gov/Courts/MichiganSupremeCourt/rules/court-rules-admin-matters/Court%20Rules/2015-12_2016-05-25_formatted%20order_various%20MCRs-ability%20to%20pay.pdf.
193. As an example, the Superior Court in San Diego County, California has implemented a Homeless Court Program, where the court is empowered to forgive fines/fees if defendants participate in programing. Thompson & McLean, *supra* note 128, at 37.
194. Coal. for the Homeless, *Homeless Court* (2016), *available at* http://www.homelesshouston.org/homeless-court/homeless-court-details.
195. 198. *See, e.g.*, Ohio Rev. Code § 131.02 (2012).
196. 199. *See Sheriff v. Gillie*, 136 S. Ct. 1594, 194 L.Ed.2d 625 (2016).
197. *See* Pew Research Ctr. *supra*, note 6.
198. States' attorneys general often have broad authority to take civil rights enforcement action, including investigating and shining a spotlight on unconstitutional practices by municipalities. For example, the New York Office of Attorney General investigated the New York City Police Department's use of stop and frisk under their authority to enforce state and federal civil rights law. *See* New York State Office of Attorney General, *Stop and Frisk Report* (1999), *available at* http://www.oag.state.ny.us/sites/default/files/pdfs/bureaus/civil_rights/stp_frsk.pdf [hereinafter *Stop and Frisk Report*].
199. *See, e.g.*, *In for a Penny*, *supra* note 15, at 5.

200. *Ferguson Report*, *supra* note 7, at 3.
201. *See, e.g.*, Note, *State Bans on Debtors' Prisons and Criminal Justice Debt*, 129 Harv. L. Rev. 1024, 1025 (2016); Alec Karakatsanis, *Policing, Mass Imprisonment, and the Failure of American Lawyers*, 128 Harv. L. Rev. 253, 254 (2015).
202. *See, e.g.*, *In for a Penny*, *supra* note 15, at 5.
203. *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983). Prior to *Bearden*, the Court had held that in probation revocation hearings, judges are required to inform defendants that they have the right to request counsel and fundamental fairness may require that counsel be appointed in certain cases. *Gagnon v. Scarpelli*, 411 U.S. 778, 790-91 (1973) (holding that a probation revocation hearing is required under the Due Process Clause and that courts must determine on a case-by-case basis whether the appointment of counsel is necessary to satisfy due process).
204. *Tate v. Short*, 401 U.S. 395, 398 (1971).
205. *See id.* at 400.
206. *Turner v. Rogers*, 564 U.S. 431, 449 (2011).
207. *Id.* at 447.
208. *Id.* at 447-48.
209. *Id.* at 449 ("We do not address civil contempt proceedings where the underlying child support payment is owed to the State, for example, for reimbursement of welfare funds paid to the parent with custody. Those proceedings more closely resemble debt-collection proceedings. The government is likely to have counsel or some other competent representative.") (internal citations omitted).
210. For example, Colorado recently enacted a statute that defines "undue hardship" as follows:
a defendant or a defendant's dependents are considered to suffer undue hardship if he, she, or they would be deprived of money needed for basic living necessities, such as food, shelter, clothing, necessary medical expenses, or child support. In determining whether a defendant is able to comply with an order to pay a monetary amount without undue hardship to the defendant or the defendant's dependents, the court shall consider:
(I) Whether the defendant is experiencing homelessness;
(II) The defendant's present employment, income, and expenses;
(III) The defendant's outstanding debts and liabilities, both secured and unsecured;
(IV) Whether the defendant has qualified for and is receiving any form of public assistance, including food stamps, temporary assistance for needy families, medicaid, or supplemental security income benefits;
(V) The availability and convertibility, without undue hardship to the defendant or the defendant's dependents, of any real or personal property owned by the defendant;
(VI) Whether the defendant resides in public housing;
(VII) Whether the defendant's family income is less than two hundred percent of the federal poverty line, adjusted for family size; and
(VIII) Any other circumstances that would impair the defendant's ability to pay. Colo. Rev. Stat. § 18-1.3-702(4).
211. For example, under Rhode Island law the following conditions constitute *prima facie* evidence of the defendant's limited ability to pay criminal justice debt: "(1) Qualification for and/or receipt of any of the following benefits or services by the defendant: (i) temporary assistance to needy families; (ii) social security including supplemental security income and state supplemental payments program; (iii) public assistance; (iv) disability insurance; or (v) food stamps." R. I. Gen. Laws § 12-20-10(b). Similarly, for misdemeanor probationers, Georgia law includes a presumption in favor of modifying fines for an "indigent" person, defined as "an individual who earns less than 100 percent of the federal poverty guidelines" unless the person has assets that could be used without undue hardship. Ga. Code Ann. § 42-8-102(c)-(e). Illinois's Statutory Court Fee Task Force released a report in June 2016 proposing major changes to the state's criminal justice debt statutes,

including a recommendation that when court-appointed criminal defense attorneys certify that their clients are indigent, certain fees are waived. *See* Statutory Court Fee Task Force, *Illinois Court Assessments: Findings and Recommendations for Addressing Barriers to Access to Justice and Additional Issues Associated with Fees and Other Court Costs in Civil, Criminal, and Traffic Proceedings*, App. E -Proposed Criminal Assessment Waiver Statute, Sec. 3-9(f) (June 2016), *available at* http://www.illinoiscourts.gov/2016_Statutory_Court_Fee_Task_Force_Report.pdf.

212. For example, a woman described in the Ferguson Report owed over $2,500 in fines and fees to three different municipalities and had already paid over $1,000 in order to resolve other criminal cases. *Ferguson Report*, *supra* note 7, at 52.

213. *See, e.g.*, Stipulated Settlement Agreement and Retention of Jurisdiction at 4-5, *Kennedy v. City of Biloxi*, No. 1:15-cv-00348-HSO-JCG (S.D. Miss. Mar. 15, 2016), *available at* https://www.aclu.org/sites/default/files/field_document/final_stipulated_settlement_agreement_exhibit_a_exhibit_b_03152016_0.pdf [hereinafter Stipulated Settlement Agreement] (agreeing to default procedure of audio recording compliance hearings that include ability-to-pay determinations; in the event audio recording is not possible, court must document in writing the ability-to-pay determination, including the finding, evidence to support said finding, and the colloquy concerning ability to pay and efforts to secure resources among other items).

214. *See, e.g.*, Diller, *supra* note 65, at 8 (finding that "[a]s a result of the lack of waivers for the indigent, communities invest significant resources pursuing debts that will never be collected"); *Ferguson Report*, *supra* note 7, at 99; Am. Law Inst., *Model Penal Code: Sentencing Tentative Draft No. 3*, 55 (Apr. 24, 2014), *available at* https://www.ali.org/projects/show/sentencing/ (prohibiting criminal justice debt of a magnitude beyond an individual's means from being imposed at all).

215. Some state courts have held that an ability-to-pay determination is required by the state constitution at the imposition stage when a state seeks to recoup the cost of court-appointed counsel. *See, e.g.*, *State v. Morgan*, 173 Vt. 533 (2001) (finding that the Sixth Amendment requires an ability to pay determination before a defendant can be charged for the cost of counsel); *People v. Love*, 687 N.E.2d 32 (Ill. 1997) (vacating a reimbursement order because the court failed to conduct a hearing and inquire into ability to pay). Similar protections have also been implemented to resolve constitutional litigation. The March 2016 settlement reached by the American Civil Liberties Union with the city of Biloxi, Mississippi regarding the city's criminal justice debt practices mandates that the Biloxi Municipal Court consider a defendant's ability to pay when determining the amount of criminal justice debt to impose. *See, e.g.*, Stipulated Settlement Agreement, *supra* note 213, at 6.

216. *See, e.g.*, Agreement to Settle Injunctive and Declaratory Relief Claims, *Mitchell v. City of Montgomery*, No. 2:14-cv-186-MHT-CSC at 11 (M.D. Ala. Nov. 17, 2014), *available at* http://equaljusticeunderlaw.org/wp/wp-content/uploads/2014/07/Final-Settlement-Agreement.pdf (listing subsequent hearings based on a defendant's changed financial circumstances as a "basic premise" of the settlement). Similarly, Rhode Island Senate Bill 2234/House Bill H8093 (2008) provides that a defendant's ability to pay and a payment schedule should be determined through "standardized procedures including a financial assessment instrument" and that court determinations should be updated in light of new financial information.

217. Stipulated Settlement Agreement, *supra* note 216, at 37.

218. *Id.* at 6.

219. *Id.* at 37.

220. *Id.*

221. *Id.* at 6.

222. *See, e.g.*, Tex Code Crim. Proc. art. 43.09 (a) ("When a defendant is convicted of a misdemeanor and his punishment is assessed at a pecuniary fine or is confined in a jail after conviction of a felony for which a fine is imposed, *if he is unable to pay the fine and costs adjudged against him*,... if there be no such county jail industries program, workhouse, farm, or improvements and maintenance

projects, *he shall be confined in jail for a sufficient length of time to discharge the full amount of fine and costs adjudged against him*")(emphasis added).

223. *See, e.g.*, Cal. Penal Code § 1205(b) ("If time has been given for payment or it has been made payable in installments, the court shall, upon any default in payment, *immediately order the arrest of the defendant* and order him or her to show cause why he or she should not be imprisoned. If the fine, restitution order, or installment, is payable forthwith and it is not so paid, the court *shall without further proceedings, immediately commit the defendant to the custody of the proper office to be held in custody until the fine or the installment thereof, as the case may be, is satisfied in full*") (emphasis added); La. Code Crim. Proc. Ann. art. 884 (1968) ("If a sentence imposed includes a fine or costs, the sentence shall provide that in default of payment thereof the defendant shall be imprisoned for a specified period not to exceed one year; provided that where the maximum prison sentence which may be imposed as a penalty for a misdemeanor is six months or less, the total period of imprisonment upon conviction of the offense, including imprisonment for default in payment of a fine or costs, shall not exceed six months for that offense").
224. *See* Iowa Code § 909.7 ("A defendant is presumed to be able to pay a fine. However, if the defendant proves to the satisfaction of the court that the defendant cannot pay the fine, the defendant shall not be sentenced to confinement for the failure to pay the fine.").
225. *See, e.g., People v. Cook*, 407 N.E.2d 56, 61 (Ill. 1980) (finding that presumption that posting of bail demonstrated an ability to pay could not substitute for a due process hearing to determine if a defendant was indigent).
226. *See, e.g., State v. Taylor*, 166 P.3d 118, 126 (Ariz. Ct. App. 2007) (rejecting a determination of a defendant's ability to pay based upon a defendant's imputed income, namely their "apparent ability to work in the future," and indicating that only present resources should be considered).
227. *See, e.g.*, Note, *State Bans on Debtors' Prisons and Criminal Justice Debt* 129 Harv. L. Rev. 1024, 1025 (2016); deVuono-powell, et al., *supra* note 15.
228. *See, e.g.*, Stipulated Settlement Agreement, *supra* note 213, at 15.
229. *See id.*
230. *See, e.g.*, Supreme Court of Ohio, *Collection of Fines and Court Costs in Adult Trial Courts* (Sept. 2015), *available at* https://www.supremecourt.ohio.gov/Publications/JCS/finesCourtCosts.pdf.
231. *See Ferguson Report*, *supra* note 7, at 55.
232. *See* ACLU of Colorado, Letter to Chief Justice Michael Bender, *Re: Incarceration of Indigent Defendants for Failure to Pay Legal Debts* 5 (Oct. 10, 2012), *available at* http://static.aclu-co.org/wp-content/uploads/2013/12/2012-10-10-Bender-Dailey-Wallace.pdf.
233. *See* Agreement to Settle Injunctive and Declaratory Relief Claims at 14, *Mitchell v. City of Montgomery*, No. 2:14-cv-186-MHT-CSC (M.D. Ala. Nov. 17, 2014), *available at* http://equaljusticeunderlaw.org/wp/wp-content/uploads/2014/07/Final-Settlement-Agreement.pdf.
234. Michigan State Planning Body, *Implementing Crossroads: A Proposal for Evaluating Ability to Pay Fines, Fees and Costs* (Reissued May 2015), Attachment B.
235. *See Ohio State Bar Assn. v. Goldie*, 119 Ohio St.3d 428, 431 (2008) ("Respondent concedes that she followed none of the procedures required to determine Webb's ability to pay assessed fines before sending him to jail. She also concedes that she 'knowingly failed to follow the law' and that her failure violated Canon 3(B)(2). We therefore find this judicial misconduct."). The Southern Poverty Law Center took similar action against an Alabama judge who forced defendants who were unable to pay court debt to donate blood or face jail time. *See* Southern Poverty Law Ctr., *Judge Who Forced Defendants to Give Blood or Go to Jail Censured After SPLC Complaint* (Jan. 21, 2016), *available at* https://www.splcenter.org/news/2016/01/21/judge-who-forced-defendants-give-blood-or-go-jail-censured-after-splc-complaint.
236. *See, e.g.*, Daniel Morales, Texas Attorney General, *Opinion DM-407*, 2237 (1996), *available at* https://www.texasattorneygeneral.gov/opinions/opinions/48morales/op/1996/pdf/dm0407.pdf

(emphasizing that the imposition of certain criminal justice debt is discretionary).

237. *See, e.g.*, Arizona Attorney General, *AG Opinions* (last visited March 8, 2016), *available at* https://www.azag.gov/ag-opinions (Arizona Attorney General opinions issued only to the legislature, any public officer of Arizona, or a county attorney. Private citizens may not seek an opinion or other legal advices.); Cal. Gov. Code § 12519 (California Attorney General opinions restricted to member of legislature, governor, lieutenant governor, secretary of state, controller, treasurer, state lands commission, superintendent of public instruction, insurance commissioner, any state agency, and any county counsel, district attorney, or sheriff upon any question of law relating to their respective offices. Private citizens do not have standing.); Tex Gov't Code § 402.042 (state attorney general opinion may be requested only by: (1) the governor; (2) the head of a department of state government; (3) a head or board of a penal institution; (4) a head or board of an eleemosynary institution; (5) the head of a state board; (6) a regent or trustee of a state educational institution; (7) a committee of a house of the legislature; (8) a county auditor authorized by law; or (9) the chairman of the governing board of a river authority. Private citizens do not have standing).
238. *See, e.g.*, Alan Wilson, Attorney General of South Carolina, *Letter re: Indigent Defense*, (Nov. 12, 2015), *available at* http://www.scag.gov/wp-content/uploads/2015/11/Ryan-H.-OS-9925-FINAL-Opinion-11-12-2015-00797179xD2C78.pdf (South Carolina Attorney General opinion issued to Deputy Director and General Counsel of South Carolina Commission on Indigent Defense).
239. *See, e.g., supra* note 198 (citing *Stop and Frisk Report*).
240. Carl Reynolds, et al., Council of State Govts. Justice Ctr. & Tex. Office of Court Admin., *Interim Report A Framework to Improve How Fines, Fees, Restitution, and Child Support Are Assessed and Collected from People Convicted of Crimes*, 21 (March 2, 2009) (describing the system of user fees and surcharges in Texas as a "nearly incomprehensible package that is difficult for court systems to administer").
241. *Standards Relating to Court Costs supra* note 51, at 7 (June 1986) ("Administrative costs rise with a proliferation of court fee statutes spread over many volumes of law. Revenue for governmental entities is lost as a result of oversights or failure to keep abreast of legislative enactments").
242. *See* ACLU of Washington, *Modern Day-Debtors' Prison: How Court-Imposed Debts Punish Poor People in Washington*, 20 (2014).
243. *See* Michigan State Planning Body, *Implementing Crossroads: A Proposal for Evaluating Ability to Pay Fines, Fees and Costs*, 24 (reissued May 2015).
244. Mich. Comp. Laws Ann. § 769.1k(8) ; § 780.905(7)(b) (2016).
245. S.D. Codified Laws § 1-55-16.
246. Statutory Court Fee Task Force, *Illinois Court Assessments: Findings and Recommendations for Addressing Barriers to Access to Justice and Additional Issues Associated with Fees and Other Court Costs in Civil, Criminal, and Traffic Proceedings* (June 2016), *available at* http://www.illinoiscourts.gov/2016_Statutory_Court_Fee_Task_Force_Report.pdf.
247. *Standards Relating to Court Costs, supra* note 52, at Standard 2.5 (June 1986).
248. Special Comm'n to Study the Feasibility of Establishing Inmate Fees, Inmate Fees as a Source *of Revenue: Review of Challenges*, 3 (July 1, 2011), *available at* http://www.mass.gov/eopss/docs/eops/inmate-fee-final-7-1-11.pdf.
249. *Id.* at 5.
250. *Id.* at 4.
251. Michael Leachman, et al., *Improving Budgetary Analysis of State Criminal Justice Reform: A Strategy for Better Outcomes and Saving Money* 8 (2012); Thompson & McLean, *supra* note 128, at 34.
252. Leachman et al., *supra* note 251, at 7.
253. *Id.*
254. *See, e.g.*, 5 Ill. Comp. Stat. 140/2 (2010); *Copley Press, Inc. v. Administrative Office of Courts*, 648 N.E.2d 324 (Ill. App. Ct. 1995); Mich. Comp. Laws Ann. § 15.232(d)(v) (2015); Tex. Gov't Code Ann. §§ 552.003(1)(B), 552.0035 (2009). *See generally* Nat'l Ass'n of Counties, *Open Records Laws: A State by*

*State Report* (December 2010), *available at* http://www.naco.org/sites/default/files/documents/Open%20Records%20Laws%20A%20State%20by%20State%20Report.pdf.

255. *See, e.g.,* Missouri Municipal Division Work Group, *supra* note 46, at 10.
256. *See, e.g.,* Wash. Rev. Code. § 9.94A.760.
257. 260. *See, e.g.,* Ga. Code Ann. § 15-13-31.
258. S. 287, 84th leg. (Tex. 2015) (codified at Tex. Code Crim. Proc. Art. 103.001).
259. *See* Human Rights Watch, *supra* note 61.
260. 263. *See, e.g.,* Cal. Penal Code § 1205, § 1463.007, § 1463.010 (1998) (California); Fla. Stat. Ann. § 938.35; Tenn. Code Ann. § 40-24-105, § 40-28-205; Wash. Rev. Code § 3.02.045, § 9.94A.760; § 36.18.190; Nev. Rev. Stat. § 176.064 ; Tex. Code Crim. Proc. Ann. Art 103.0031; Ga. Code Ann. § 15-21-12 (2014); Ala. Code § 12-17-225.7; Miss. Code Ann. § 19-3-41(2) (2013); Mont. Code Ann. § 46-17-402 (2005).
261. *See, e.g.,* M.S.L.J., *Paying for Poverty,* The Economist, April 25, 2015, *available at* http://www.economist.com/blogs/democracyinamerica/2015/04/private-probation-firms.
262. H.R. 310, Reg. Sess. (Ga. 2015) (codified at Ga. Code Ann § 42-8-108). The Board of Community Supervision is made up of the commissioner of corrections, the commissioner of juvenile justice, the chairperson and vice chairperson of the State Board of Pardons and Paroles, director of the Division of Family and Children Services of the Department of Human Services, and commissioner of behavioral health and developmental disabilities, a sheriff, a mayor or city manager, a county commissioner or county manager, and "[a]n individual who owns or is employed by a private corporation, private enterprise, private agency, or other private entity that is providing probation supervision services." S. 367, Reg. Sess. (Ga. 2016).
263. 266. Ga. Code Ann. § 42-8-108 (2010).
264. Rhode Island Family Life Ctr., *Court Debt and Related Incarceration in Rhode Island,* 29 (May 2007), *available at* https://csgjusticecenter.org/wp-content/uploads/2013/07/2007-RI-Family-Life-Center.pdf. (citing inconsistent record keeping across jurisdictions).
265. *See, e.g.,* North Carolina Admin. Office of the Courts, *Court Costs and Fees Chart* (Oct. 2015), http://www.nccourts.org/Courts/Trial/Documents/court_costs_chart-Oct2015-criminal.pdf; Wisconsin Court System, *Wisconsin Circuit Court Fee, Forfeiture, Fine and Surcharge Tables* (Jul. 14, 2015), *available at* https://www.wicourts.gov/courts/circuit/docs/fees.pdf; Mass. Trial Court Dist. Court Dep't, *Potential Money Assessments in Criminal Cases* (revised Dec. 2015), *available at* http://www.mass.gov/courts/docs/courts-and-judges/courts/district-court/potential-moneyassessment -criminalcases.pdf.
266. *See, e.g.,* City of Tucson, *Tucson City Court: Frequently Asked Questions* (2016), *available at* https://www.tucsonaz.gov/courts/frequently-asked-questions; Maine Judicial Branch, Admin. Office of the Courts, *Court Fines & Fees: Frequently Asked Questions* (last visited 2016), *available at* https://www10.informe.org/courts/fines/faq/; Stipulated Settlement Agreement, *supra* note 216 (mandating language for the website of the Biloxi Municipal Court).
267. Supreme Court of Colorado, *Directive Concerning the Assessment and Collection of Statutory Fines, Fees, Surcharges and Costs in Criminal, Juvenile, Traffic and Misdemeanor Cases,* Directive 85-31 (August 2011), *available at* https://www.courts.state.co.us/Courts/Supreme_Court/Directives/85-31%20Amended%208-19-11.pdf.
268. *See* Commonwealth of Virginia, Auditor of Public Accounts, *Review of Virginia Courts Management of Unpaid Fines and Costs, Special Report* (November 20, 2000), *available at* http://www.apa.state.va.us/reports/fines00.pdf.

CRIMINAL JUSTICE
POLICY PROGRAM
HARVARD LAW SCHOOL

Austin Hall, 1st floor
1515 Massachusetts Ave
Cambridge, MA 02138
Phone: 617-495-4848
cjpp.law.harvard.edu